UNITED STATES of America, Appellee,

v.

Vittorio AMUSO, also known as
Jesse, also known as Vic,
Defendant–Appellant.

No. 135, Docket 92–1672.

United States Court of Appeals,
Second Circuit.

Argued Sept. 20, 1993.

Decided April 20, 1994.

Judd Burstein, New York City (Marc Fernich, Kim P. Bonstrom, of counsel), for defendant-appellant.

Kevin P. McGrath, Asst. U.S. Atty., Brooklyn, NY (Zachary W. Carter, U.S. Atty., E.D.N.Y., Geoffrey S. Mearns, Gregory J. O'Connell, Asst. U.S. Attys., E.D.N.Y., of counsel), for appellee.

Before: VAN GRAAFEILAND, WALKER, and JACOBS, Circuit Judges.

WALKER, Circuit Judge:

Defendant-appellant Vittorio Amuso appeals from a judgment of conviction on charges of racketeering, extortion, fraud, bribery, and murder. The government charged Amuso, in a fifty-four count indictment, with violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c) and (d), as well as tax fraud and substantive and conspiracy violations constituting the RICO predicate acts. After a jury trial in the United States District Court for the Eastern District of New York (Eugene H. Nickerson, *Judge* ), Amuso was convicted on all fifty-four counts and sentenced, *inter alia,* to life in prison.

On appeal, Amuso challenges evidentiary rulings which (1) allowed evidence of Amuso's flight and continued absence to be used as evidence of consciousness of guilt; (2) excluded certain extrinsic negative character evidence pertaining to a prosecution witness; (3) admitted evidence of criminal conduct by one of Amuso's co-conspirators; and (4) allowed expert testimony regarding the structure and terminology of organized crime families. Amuso also claims that the district court erred in deciding to empanel an anonymous and sequestered jury.

We affirm.

## BACKGROUND

In an earlier indictment filed on May 30, 1990, not the subject of the trial below or this appeal, Amuso and fourteen codefendants were charged in various RICO counts with corrupting the profitable window replacement industry in New York City. That indictment (the "Windows indictment") alleged that the defendants gained control of the union responsible for window replacement in New York City, Local 580 of the Architectural and Ornamental Ironworkers, and extorted illegal payoffs from window replacement companies in exchange for labor peace. The Windows indictment also charged as part of the scheme that the defendants controlled window manufacturing and installation companies, rigged bids for public window replacement contracts to favor their companies, and forced legitimate companies out of the market through intimidation and threats of violence.

When the trial on the Windows indictment (the "Windows trial") began on May 8, 1991, Amuso was a fugitive. In May 1990, upon learning of the impending Windows indictment, Amuso had fled New York City and gone into hiding. Amuso remained a fugitive until July 1991 when FBI agents captured him in Scranton, Pennsylvania and brought him back to New York.

In April 1992, the grand jury returned a superseding indictment (the "indictment") that was the basis for the trial in the district court and this appeal. In addition to the Windows indictment charges, the indictment charged Amuso with tax fraud conspiracy and with fourteen murders, attempted murders, and/or conspiracies to murder, at least five of which were said to have been committed while Amuso was a fugitive. The indictment alleged that as boss of the Luchese crime family, Amuso possessed ultimate and exclusive authority to approve murders on behalf of the family, that he exercised this authority frequently, and that he retained this power while on the run.

At a pretrial hearing, Judge Nickerson granted the government's motion for an anonymous and sequestered jury. In May 1992, the Windows and murder charges, along with a charge that Amuso conspired to defraud the United States by filing a false and misleading tax return, proceeded to trial.

*The Trial*

### 1. *The Windows Counts*

The evidence adduced at trial to prove the Windows counts was substantial and is not challenged on appeal. It included testimony by Peter Savino, Amuso's long-time associate in the window industry, who described how Amuso and the heads of other New York crime families effectively controlled the bidding for New York City Housing Authority window installation contracts. Savino's testimony was corroborated by tape recorded conversations among the Windows conspirators, surreptitiously obtained by Savino over an eighteen month period during which he was cooperating with the government. In the conversations, high ranking officials from several crime families discussed the extensive nature of organized crime's control over the window replacement industry in New York and Amuso's involvement in the enterprise. Additionally, Peter Chiodo, a former "captain" of the Luchese family turned government witness, testified that beginning in December 1989 he was Amuso's agent in the Windows conspiracy at the highest level, supervising the labor racketeering activities of Local 580 on the Luchese family's behalf. Chiodo's testimony was also corroborated by tape recorded evidence.

### 2. *The Murder Counts*

The primary evidence in support of the murder related charges came through the testimony of Chiodo and another former Luchese family captain, Alphonse D'Arco. D'Arco and Chiodo described a murderous campaign by Amuso between 1988 and 1991 to eliminate anyone he suspected of disloyalty, including an entire faction of the Luchese family and, ultimately, D'Arco and Chiodo themselves. They testified that as boss of the Luchese family, Amuso ordered either one or both of them to carry out thirteen of the murders or attempted murders charged in the indictment. D'Arco also testified that he was ordered to murder the fourteenth intended victim, Chiodo, before he himself became the target of a murder contract or-

dered by Amuso. Other witnesses and documents corroborated some of the murder and attempted murder charges, but the convictions on these charges depended primarily on the jury's crediting D'Arco's and Chiodo's testimony. In addition, a government expert testified that no murder by or on behalf of a member of an organized crime family can be carried out without approval of that family's boss.

The first of the murders charged in the indictment was that of Sorecho "Sammy the Arab" Nalo. Describing the events leading to Nalo's murder, Chiodo testified that Amuso assigned him to supervise the illegal gambling operation of Spyredon "Spiros" Velentzas. Velentzas told Chiodo that Nalo was encroaching on his illegal gambling activities, a portion of which benefitted the Luchese family, and requested the aid of the Luchese family in murdering Nalo. According to Chiodo, Amuso was hesitant at first because Velentzas was not formally affiliated with an organized crime family, but after Chiodo told Amuso that Velentzas feared for his life, Amuso told Chiodo that it was "okay" to proceed with Nalo's murder. Chiodo assigned the murder to several Luchese family soldiers. They subsequently shot Nalo to death in his travel agency on October 25, 1988.

On or about February 6, 1989, Thomas "Red" Gilmore was shot to death. D'Arco testified that in late 1988, Amuso told D'Arco that he suspected Gilmore of being an informant and that he wanted Gilmore killed. D'Arco met with Amuso periodically thereafter and, according to D'Arco, Amuso continued to press for Gilmore's murder. Eventually, the Luchese soldier assigned to the murder reported to D'Arco that it had been accomplished, and D'Arco in turn conveyed this information to Amuso.

Three months later on May 13, 1989, Michael Pappadio was bludgeoned and shot to death. D'Arco testified that he personally committed the murder with an accomplice, acting on Amuso's orders. Pappadio was a member of the Luchese crime family responsible for monitoring the family's interests in New York City's garment center. Amuso suspected Pappadio of "hiding shops"—that is, keeping extortion income for himself and not reporting it to Amuso. According to D'Arco, when Pappadio refused to comply with Amuso's orders to stay out of the garment district and to bring in certain books and records for inspection, Amuso ordered D'Arco to kill Pappadio. D'Arco described the murder, including his efforts to dispose of the body, and recounted that Amuso praised him when he reported that the murder had been carried out successfully. As corroboration, Chiodo testified to a conversation with Anthony "Gaspipe" Casso, Amuso's "consigliere" and second in command. Referring to Pappadio, Casso told Chiodo, "I've got to look that guy up." Chiodo understood this to mean that Casso was planning to have Pappadio killed. The government also introduced Amuso's tax returns, which showed income from a garment center company called Supreme Garment Carriers, Inc., to substantiate its claim that Amuso had an interest in the garment center.

On September 13, 1989, John Petrucelli, a soldier in the Luchese crime family, was shot to death. According to D'Arco, Petrucelli fell into disfavor with Amuso because he was hiding Constantine "Gus" Farace, an associate of the Bonanno crime family who was suspected of killing a Drug Enforcement Administration agent. Under increasing pressure from federal agents, Amuso instructed D'Arco to tell Petrucelli that "he should kill Gus Farace, and right away, or shoot himself." Shortly thereafter, Casso told D'Arco that Amuso was "fuming" about the Petrucelli situation, and that D'Arco should tell Michael Salerno, another Luchese family captain, to kill Petrucelli. Chiodo testified that Petrucelli was indeed a member of the Luchese family, and that he had discussed Petrucelli at a meeting with Amuso and Casso. At one point during the meeting Amuso said, "They say I kill my friends," which Chiodo understood to be a reference to Petrucelli's murder.

John "Sonny" Morrissey was murdered on September 17, 1989. Chiodo testified that Amuso and Casso suspected Morrissey of cooperating in the Windows case, and that they ordered Chiodo to kill Morrissey and bury his body where it would not be found.

Chiodo and several Luchese family members shot Morrissey to death and then buried his body near a stone wall. D'Arco testified that he met with Amuso and Casso in the summer of 1990 and they discussed the Windows case. At one point Casso said to Amuso, "We got rid of Sonny." Though he did not know at that point who Sonny was, D'Arco understood this to mean that Amuso and Casso had ordered Sonny's murder. In 1991, after an attempt on Chiodo's life failed and he began cooperating with the government, Chiodo led government agents to Morrissey's body.

The indictment next charged Amuso with conspiracy to murder Anthony Accetturo Sr., his son Anthony Accetturo Jr., and Joseph LaMorte, and attempted murder with respect to LaMorte. The Accetturos and LaMorte were members of the New Jersey faction of the Luchese crime family whom Amuso suspected of disloyalty. Chiodo testified that Amuso ordered him to kill the Accetturos, but that they went into hiding and could not be found. At one point Casso, in Amuso's presence, ordered Chiodo to kidnap LaMorte and torture him until he revealed the Accetturos' whereabouts. The kidnapping plan failed, but Chiodo and several Luchese soldiers later shot LaMorte, again acting on Casso's orders. LaMorte survived the attack; the Accetturos were never found.

D'Arco confirmed Chiodo's story. He testified that he attended a number of meetings with Amuso and Casso at which they discussed "whacking" the Accetturos, that he also was instructed by Amuso and Casso to kill the Accetturos, and that he was aware of Chiodo's efforts to the same effect. As further support, the government introduced American Express receipts and Florida hotel records coinciding with the time period Chiodo testified he was in Florida trying to locate the Accetturos and LaMorte, as well as photographs D'Arco gave the government when he began cooperating, which he testified were used in tracking the Accetturo crew members targeted by Amuso.

Amuso was also charged with conspiracy to murder and attempted murder of Joseph Martinelli. Martinelli was the owner of a large concrete company who made substantial payoffs to the Luchese family. At one point when Martinelli fell behind, Amuso and Casso told Chiodo to make sure Martinelli resumed his payments. According to Chiodo, Martinelli told him that business was slow and that he was unable to make the payments. Several months later, after Martinelli failed to heed Chiodo's requests, Chiodo met with Amuso and Casso and asked them to be patient. Casso told Chiodo, "What's the matter with you? Don't you know we want this guy clipped?" When Chiodo responded that he was not aware of that plan, Casso said, "Maybe his partner will get the message after we clip him." Thereafter, Martinelli accompanied Chiodo on a trip to Staten Island, purportedly to attend a secret meeting with Amuso who was by this time a fugitive from the Windows case. Chiodo testified that he pulled over to the side of the road, "pulled out a pistol . . . leaned into the passenger door and . . . squeezed the trigger four or five times." The gun did not fire because, as Chiodo later discovered, the magazine was not properly installed. Chiodo explained the incident to Martinelli as a joke using a realistic toy gun. Martinelli accepted the explanation.

D'Arco confirmed that Amuso and Casso had assigned Chiodo to murder Martinelli. According to D'Arco, Amuso and Casso asked D'Arco to assist Chiodo in forcing Martinelli to resume his payments. He recounted several conversations in which Casso expressed his displeasure at Chiodo's inability to carry out the hit, and castigated Chiodo for his failure. Eventually, Martinelli met with D'Arco and agreed to pay Amuso and Casso $60,000 and to use companies affiliated with the Luchese crime family as his concrete and steel suppliers. No further attempts were made on Martinelli's life; however, Amuso never lifted the murder contract.

The indictment also charged Amuso with the murder of Michael Salerno. Salerno was a member of the Bronx faction of the Luchese family. According to D'Arco, Amuso viewed Salerno as a rival because he thought Salerno was disappointed when he was not selected to be boss of the Luchese organization or to participate in its administration.

In May 1990, a short time before Amuso and Casso fled to avoid arrest on the original Windows indictment, Casso told D'Arco that Salerno was a "rat" and that Amuso wanted him killed. D'Arco instructed a soldier under Salerno's control to kill Salerno; Salerno was stabbed and shot to death in early June 1990. D'Arco told the jury that at a meeting with Amuso and Casso (who were then in hiding), Amuso congratulated and praised D'Arco for his role in the Salerno murder. Chiodo also testified that Amuso and Casso did not like or trust Salerno. According to Chiodo, Casso asked Chiodo to go to the Bronx and check up on Salerno because Salerno was conducting Luchese family business in a way that offended Amuso and Casso. Shortly before Salerno's murder, Amuso and Casso told Chiodo that he might have to "go up and take over the Bronx crew for Mike Salerno."

Later that summer on August 24, 1990, another member of the Luchese family, Bruno Facciola, was stabbed and shot to death. D'Arco testified that after Amuso and Casso fled, they told him that Facciola was a "rat" who had to be killed. D'Arco learned that another Luchese captain was also assigned to murder Facciola, and eventually that the murder had been carried out. Chiodo told the jury that when he asked D'Arco why Facciola was murdered, D'Arco told him "they told me he went bad." By "they," Chiodo understood D'Arco to be referring to Amuso and Casso.

The following year, Luchese family associates Al Visconti and Larry Taylor were murdered in February and March 1991, respectively. According to D'Arco, Visconti and Taylor, in concert with Facciola, were suspected of informing authorities in California that D'Arco's son had murdered one Anthony DiLapi, and of plotting to kill several Luchese family members including D'Arco and his son. D'Arco also explained that Amuso thought Visconti was a disgrace to the Luchese family because he had a reputation of engaging in homosexual acts in prison. Amuso and Casso ordered D'Arco to arrange Visconti's and Taylor's murder, which he did. D'Arco said that when Amuso learned of Visconti's killing, he sent word indirectly to D'Arco that he was pleased that the murder was carried out so quickly.

The final murder related count charged Amuso with the attempted murder of Peter Chiodo. Chiodo testified that Amuso swore him in as a "made" member of the Luchese family in 1987, and promoted him to "captain" in 1988. According to Chiodo, by late 1989 his relationship with Amuso and Casso deteriorated because they were dissatisfied with his progress on several murder contracts. In addition, Amuso and Casso were upset at Chiodo's decision to plead guilty to the Windows and certain unrelated charges without first getting their permission. D'Arco testified that Amuso and Casso came to suspect Chiodo of cooperating with the government, and ordered D'Arco to kill Chiodo. D'Arco, in turn, assigned the murder to several Luchese family soldiers who informed D'Arco that they shot Chiodo twelve times, but that he might still be alive. Chiodo survived and became a government witness soon thereafter.

After deliberating for less than a day, the jury returned a verdict finding Amuso guilty on each of the fifty-four counts charged in the indictment. On October 9, 1992, Judge Nickerson sentenced Amuso, *inter alia*, to life in prison, a $250,000 fine, and a special assessment of $2,700. This appeal followed.

## DISCUSSION

### I. *Evidentiary Rulings*

#### A. *Evidence of Flight and Continued Absence*

Amuso first challenges Judge Nickerson's decision to admit evidence of Amuso's flight, and to instruct the jury that his flight and continued absence could be used as evidence of consciousness of guilt. Amuso left New York shortly before the original Windows indictment was filed and remained a fugitive until his capture fourteen months later. Amuso claims that because several of the murders charged in the superseding indictment took place while he was already in hiding, his flight could not possibly prove his consciousness of guilt with respect to those charges. He also contends that Judge Nickerson erred in allowing the jury to infer

consciousness of guilt from his "continued absence" after he knew that witnesses with knowledge of his activities were cooperating with the government. Amuso argues that the admission and use of the flight and continued absence evidence was so prejudicial as to require reversal of the murder charges. He further contends that since the murder charges were an integral and inflammatory part of the indictment and evidence, we should reverse the Windows charges as well based on spillover prejudice.

### 1. Admissibility of the Flight Evidence

As a threshold matter, Amuso asserts that the district court erred by admitting evidence that he fled New York in May 1990, shortly before the original Windows indictment came down. He contends that there was no factual predicate for admitting evidence of his flight because D'Arco, the government's own witness, testified that Amuso fled because he thought he would have a better chance against the Windows charges if he were tried alone. The government responds that evidence of Amuso's flight was relevant independently to explain the factual background behind the murder conspiracies that took place while Amuso was on the run.

We agree with the government that the fact of Amuso's flight was relevant to several of the crimes charged in the indictment. The indictment alleged that Amuso retained exclusive authority to authorize murders while he was a fugitive, that he ordered at least five murders while on the run, and that he continued to press for the completion of murder contracts he ordered before he became a fugitive from the Windows trial. "Evidence that does not directly establish an element of an offense may be relevant to show 'the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed.'" *United States v. Simmons*, 923 F.2d 934, 948 (2d Cir.) (quoting *United States v. Daly*, 842 F.2d 1380, 1388 (2d Cir.), *cert. denied*, 488 U.S. 821, 109 S.Ct. 66, 102 L.Ed.2d 43 (1988)), *cert. denied*, 500 U.S. 919, 111 S.Ct. 2018, 114 L.Ed.2d 104 (1991). The fact of Amuso's flight was necessary to the jury's complete understanding of

how Amuso conducted his business while he was a fugitive.

For example, D'Arco testified that one. of Amuso's motivations in ordering him to murder Michael Salerno was that Amuso feared that Salerno might challenge his authority as boss of the Luchese family while he was in hiding. Amuso's flight also explained why D'Arco communicated with Amuso mostly over the telephone and through other indirect channels during this period. Thus, the flight evidence was admissible to establish the context surrounding the murders ordered while Amuso was a fugitive, and it was referred to in this way by the government in summation.

Insofar as the government argued in summation that Amuso's flight showed his consciousness of guilt with respect to the Windows charges, Amuso cannot contend seriously that this course was inappropriate. Amuso does not dispute that he fled the jurisdiction upon learning of the Windows charges; instead, he argues that the evidence at trial was inconsistent with an inference that his flight was prompted by consciousness of guilt. Thus, he argues that any marginal probative value of such evidence to the government was outweighed by its potential prejudice.

 The fact that a defendant's flight is subject to varying interpretations does not lead inevitably to the conclusion that the district court abused its discretion in admitting flight evidence. *See United States v. Ayala*, 307 F.2d 574, 576 (2d Cir.1962). Where the evidence passes the threshold inquiry of relevance, "[t]he accepted technique is for the judge to receive the evidence and permit the defendant to bring in evidence in denial or explanation." *Id.* While trial judges should be aware of the limitations of flight as circumstantial evidence of guilt, the threshold decision on whether to admit such evidence in a particular case falls within the judge's sound discretion, and will be disturbed only when that discretion is abused. *See United States v. Dillon*, 870 F.2d 1125, 1126 (6th Cir.1989); *United States v. Hernandez–Bermudez*, 857 F.2d 50, 53 (1st Cir. 1988).

■ While the jury reasonably could have found that Amuso left New York to avoid spillover prejudice on the Windows charges, it was just as reasonable for the jury to conclude that he fled out of consciousness of guilt. Notably, D'Arco's testimony was not that Amuso fled because he thought he was innocent and would be falsely convicted on the Windows indictment; D'Arco simply stated that Amuso said he thought he had a better chance of acquittal if he stood trial alone. A desire for acquittal is not necessarily inconsistent with consciousness of guilt, and the jury reasonably could have concluded that either or both motives was the catalyst behind Amuso's flight. The district court was in the best position to examine the evidence and judge the potential prejudice to Amuso that could arise from admitting it. *See United States v. Rivera,* 971 F.2d 876, 885 (2d Cir.1992); *Simmons,* 923 F.2d at 948. The court did not abuse its discretion in this case by putting the fact of Amuso's flight before the jury.

### 2. *The Jury Instruction on Flight and "Continued Absence"*

Amuso next contends that even if the flight evidence was properly admitted, the district court erred by instructing the jury that it could consider, as evidence of Amuso's guilt, his "continued absence" after he knew persons with knowledge of his activities were cooperating with the government. Amuso asserts that with no murder charges in the original Windows indictment, the only rational inference that could be drawn from his initial flight, if any, was consciousness of guilt as to the Windows charges. Thus, he argues that it was improper to instruct the jury that it could consider his flight as evidence of any murder charges.

Judge Nickerson's complete instruction to the jury on consciousness of guilt was as follows:

There has been evidence that defendant fled from New York and from his family home in Brooklyn just prior to the return on May 30, 1990, of the indictment in the so-called "Windows" case and that he remained absent from New York, except for occasional clandestine visits, until after he

was arrested in Pennsylvania on July 28, 1991 and brought back.

If proved, the flight of a defendant *after he thinks that he is to be accused of a crime,* and his continued absence after he has reason to believe that witnesses with knowledge of his activities may be cooperating with the government, may tend to prove that the defendant believed that he was guilty. You may weigh this together with all the other evidence.

But flight or continued absence may not always reflect feelings of guilt. Moreover, feelings of guilt, which are present in many innocent people, do not necessarily reflect actual guilt.

You are cautioned that evidence of flight or continued absence of a defendant may not be used by you as a substitute for proof of guilt. Flight or continued absence does not create a presumption of guilt.

Whether or not evidence of flight and continued absence does show that the defendant believed he was guilty, and the significance, if any, to be given to the defendant's feelings on this matter are for you to determine. (Emphasis added).

■ Amuso's first argument, that the district court improperly allowed the jury to consider his initial flight as evidence of the murder charges, is belied by the jury instruction itself. By the terms of the instruction, the jury was allowed to use the flight evidence only with respect to those crimes Amuso thought he was to be charged with when he fled. Since the original Windows indictment did not contain any murder charges, a fact of which Amuso was aware, the only rational inference the jury could draw was that Amuso's flight indicated consciousness of guilt only with respect to the Windows charges. Thus, the jury could not have inferred guilt as to any murder charges from his initial flight.

Amuso raises a more substantial point, however, when he asserts that even if admission and the instruction on flight was proper, the district court improperly expanded the scope of permissible inferences that could be drawn from the flight evidence by instructing the jury that it could consider, in determin-

ing his guilt, his "continued absence" after he had knowledge that witnesses were cooperating with the government. Since D'Arco did not begin cooperating until after Amuso's capture, charges about which D'Arco had knowledge were not implicated by the instruction. However, because Chiodo began cooperating with the government before Amuso was captured, the instruction permitted the jury to consider Amuso's continued absence after he learned Chiodo was cooperating with the government as evidence of his guilty conscience with respect to those murders about which Chiodo had knowledge.

■ This court has not previously decided whether "continued absence" may be considered by a jury as probative of a defendant's consciousness of guilt. We note, however, that the same considerations that allow a jury to use flight evidence in a proper case also protect a defendant from undue prejudice with respect to continued absence. Before a district court may instruct the jury regarding flight it must determine that the evidence is relevant, and there must be a factual predicate in the record from which a reasonable jury can make the required inferences that give flight evidence its probative value. *United States v. Sanchez*, 790 F.2d 245, 252 (2d Cir.), *cert. denied*, 479 U.S. 989, 107 S.Ct. 584, 93 L.Ed.2d 587 (1986). The requisite factual predicate ensures that the evidence is probative in a legal sense and protects the defendant against the possibility of the jury drawing unsupported inferences from otherwise innocuous behavior. The trial court's ability to exclude flight evidence as unduly prejudicial, even when a proper factual predicate exists, affords the defendant additional protection.

■ When there is an adequate factual predicate that a defendant remained a fugitive because of a guilty conscience, his continued absence is probative in much the same way as his initial flight. The probative value of continued absence evidence, as with flight (and all other circumstantial evidence), will depend on the strength of the factual predicate from which certain inferences can be drawn. As a factual predicate, the government must establish that the defendant remained absent because of his consciousness

of guilt with respect to the particular crimes charged.

■ When the predicate is weak the probative value of continued absence evidence will be marginal; the trial court must consider this when balancing its probative value against any prejudice, and exercise its discretion to exclude the evidence where appropriate. When admitted, the defendant remains free to refute continued absence evidence with evidence in explanation or denial. *See Ayala*, 307 F.2d at 576. Because continued absence evidence can be probative in a particular case, however, we are unable to accept the defendant's position that this evidence should be excluded as a matter of law. We will review only to determine whether the factual predicate was sufficient to warrant a jury instruction as a matter of law, and whether the district court abused its discretion under Fed.R.Evid. 403.

■ Turning to the facts of this case, we conclude that the record does not reveal a factual predicate sufficient to warrant the district court's jury instruction on continued absence. According to D'Arco, the government's own witness, Amuso's express intention when he left New York was to avoid trial with his codefendants on the original Windows indictment, and to return at a later date to face trial on his own. The government claims that the factual predicate can be inferred from evidence that before he discovered that Chiodo was cooperating with the government Amuso discussed the timing of his return with D'Arco on several occasions but, after learning of Chiodo's defection, such discussions ceased. Beyond this ambiguous silence the government offered no evidence to show that Amuso had deviated from his original plan to return after the original Windows trial concluded. To the contrary, because Amuso was captured before the completion of the Windows trial, the government was unable to show that Amuso changed his mind and decided to remain a fugitive indefinitely. It was therefore error for the court to instruct the jury that it could consider Amuso's continued absence as consciousness of guilt with respect to any of the murder charges.

However, the court's improper instruction with respect to Amuso's continued absence does not require reversal of the murder related charges because the error was harmless in light of the overwhelming evidence of Amuso's guilt. *See Hernandez–Bermudez,* 857 F.2d at 53; *Sanchez,* 790 F.2d at 253. The government established its case against Amuso primarily through direct testimony from either D'Arco, Chiodo, or both of them, to the effect that Amuso directly ordered the murders charged in the indictment. D'Arco and Chiodo gave detailed testimony and, although there were some inconsistencies, their testimony was largely corroborative. In light of this powerful direct evidence, it is not likely that the jury based its verdict on the peripheral continued absence evidence. *See United States v. Biasucci,* 786 F.2d 504, 515 (2d Cir.), *cert. denied,* 479 U.S. 827, 107 S.Ct. 104, 93 L.Ed.2d 54 (1986).

Furthermore, neither the jury instruction nor the government's use of the continued absence evidence would have caused such evidence to be a central issue in the jury's deliberations. Although the court's instruction on continued absence was improper, the portion of the instruction relating to continued absence highlighted to the jury the inherent weakness of such evidence. *See United States v. Ramirez,* 894 F.2d 565, 571 (2d Cir.1990); *United States v. Castro,* 813 F.2d 571, 578 (2d Cir.), *cert. denied,* 484 U.S. 844, 108 S.Ct. 137, 98 L.Ed.2d 94 (1987). The court told the jury that Amuso's continued absence might not have been prompted by consciousness of guilt, or that any such consciousness could have been unfounded. The court added that the weight, if any, the jury gave continued absence evidence should be assessed in light of the other evidence in the case, and that continued absence evidence, standing alone, was insufficient for a conviction. Given this careful instruction, it is unlikely that the jury accorded much significance to Amuso's continued absence.

Additionally, the government's use of the "continued absence" evidence in summation was limited. In more than a day of summation Amuso points to only one instance where the government argued directly that an inference of Amuso's guilt as to the Chiodo murders could be drawn from his continued absence:

> He [Chiodo] had a world of murder and mayhem with Mr. Amuso and Mr. Casso to testify about. Mr. D'Arco said from that point, when [Chiodo] survived the murder, Mr. Amuso and Mr. Casso never mentioned any intention of returning. . . .

Transcript at 4443. In addition, Amuso points to a lone comment made during the prosecution's opening statement that "once Peter Chiodo agreed to testify, any thoughts that Vic Amuso had of surrendering vanished."

Although these comments are improper in light of our holding, they must be examined in the context of the evidence taken as a whole. *United States v. Casamento,* 887 F.2d 1141, 1189 (2d Cir.1989), *cert. denied,* 493 U.S. 1081, 110 S.Ct. 1138, 107 L.Ed.2d 1043 (1990). As noted above, the other evidence in the case was substantial. Our review of how the evidence was handled by the court and prosecutor leaves no doubt in our minds that Amuso's conviction on the murder related counts depended not upon any claim of consciousness of guilt, but upon the credit given to D'Arco's and Chiodo's testimony. Thus, we conclude that Amuso was not prejudiced by the erroneous portion of the instruction.

In sum, the district court properly admitted evidence of Amuso's flight and instructed the jury that it could consider the flight with respect to the Windows charges. The court's instruction with respect to Amuso's "continued absence" was erroneous because it was unsupported in the record by a factual predicate that Amuso remained a fugitive because he thought Chiodo was cooperating with the government. However, the error was harmless in light of the manner in which continued absence was presented in the charge, the minimal use the government made of it, and the substantial independent direct evidence of Amuso's guilt.

**B.** *Extrinsic Negative Character Evidence Regarding D'Arco*

At trial Amuso offered certain documentary evidence to the effect that in 1984 D'Arco

submitted false sworn statements to a court. The documents included a sworn affidavit, a bail application, and an appellate brief D'Arco filed *pro se* in an attempt to obtain release on bail pending appeal of his conviction on drug charges. Amuso's counsel moved to admit the documents into evidence under Fed.R.Evid. 404(b) as a prior similar act evidencing D'Arco's ability to "manipulate the system." The government objected on relevancy and confusion grounds; the court sustained the government's objection as to the brief, but allowed counsel to admit the affidavit signed by D'Arco swearing to the truth of the brief. Amuso claims that by excluding the actual brief, the district court violated the Sixth Amendment by depriving him of the only effective evidence with which he could confront D'Arco's testimony on direct examination, and develop in evidence the scheme and plan allegedly motivating D'Arco to lie to the government and the jury about Amuso's involvement in the case.

In proffering his argument that the evidence was admissible under Rule 404(b), Amuso relies on our decision in *United States v. Aboumoussallem*, 726 F.2d 906 (2d Cir.1984). In *Aboumoussallem*, we held that a defendant accused of knowingly importing drugs could introduce evidence that his co-conspirators had previously duped other couriers into transporting drugs, when the defendant's own defense was that he himself was duped. *Id.* at 911–12. *Aboumoussallem* is distinguishable since it involved evidence directly relevant to the defendant's own knowledge which was an element of the offense. Here, the only purpose behind introducing D'Arco's papers was not to disprove an element of the offense, but to show that D'Arco had lied on a prior occasion and thus was lying now. Impeachment of a witness's credibility by such extrinsic evidence generally is not permitted. Fed.R.Evid. 608(b).

 We need not determine the precise contours of *Aboumoussallem*, however, because we find, as we did in that case, that even if the documents were admissible under Rule 404(b), Judge Nickerson did not abuse his discretion in excluding them under Rule 403 on grounds of prejudice and jury confusion. *See Aboumoussallem*, 726 F.2d at 912.

Amuso was not prevented from confronting D'Arco with his prior false statements and thoroughly examining D'Arco's prior crimes. On cross-examination Amuso's counsel was able to elicit repeated and detailed testimony from D'Arco regarding his previous lack of candor with the court in his bail motion. Amuso asserts that the documentary evidence was necessary to show the jury that D'Arco had previously constructed an elaborate story to deceive a court when it served his self-interest. However, in light of D'Arco's admissions on cross, the documentary evidence would have been cumulative and potentially confusing to the jury. Therefore, we cannot say Judge Nickerson abused his discretion by excluding it. *See United States v. Beech–Nut Nutrition Corp.*, 871 F.2d 1181, 1193–94 (2d Cir.) (court did not abuse discretion by excluding evidence as cumulative and confusing where prior testimony established all elements of the defense), *cert. denied*, 493 U.S. 933, 110 S.Ct. 324, 107 L.Ed.2d 314 (1989).

### C. *Evidence of Criminal Conduct by Anthony Casso*

Amuso next raises the issue of whether the trial court erred by admitting into evidence the contents of a safe deposit box belonging to Anthony Casso. At trial, the prosecution offered evidence that Casso was Amuso's close associate and a high ranking member of the Luchese family responsible for the family's financial dealings while he and Amuso were on the run. The evidence included a diamond ring worth approximately $400,000, and $200,000 in cash that was stored in a Milk–Bone Dog Biscuit box. The government contends that the evidence was directly relevant to prove that Amuso was the head of an enterprise engaged in racketeering activities, and to prove that he was engaged in a conspiracy to defraud the federal government by structuring his "business" to avoid paying tax on substantial portions of his income.

As a general proposition, all relevant information is admissible under the Federal Rules of Evidence unless specifically excluded. *See* Fed.R.Evid. 402; *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, ── U.S. ──, ──

——, 113 S.Ct. 2786, 2793–94, 125 L.Ed.2d 469 (1993). Rule 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Amuso claims that the contents of the safe deposit box should have been excluded under Rule 403 because they were not relevant to the government's case and were highly prejudicial.

District courts have broad discretion to determine the relevancy of evidence and that determination will not be overturned unless it is arbitrary or irrational. *United States v. Cruz*, 797 F.2d 90, 95 (2d Cir.1986). Amuso claims that Judge Nickerson's decision to admit the contents of Casso's safe deposit box was arbitrary and irrational because there was no basis from which a jury could link Amuso to the evidence. We disagree. D'Arco and Chiodo both testified that Amuso and Casso conducted Luchese family business primarily in cash, and structured their financial transactions to hide income from the government. D'Arco testified that Casso controlled the Luchese family's finances as Amuso's agent while Amuso and Casso were fugitives. D'Arco corroborated his testimony by producing extensive handwritten records that showed several hundred thousand dollars in cash flowing from D'Arco to Amuso and Casso during the period when Amuso and Casso were on the run.

Amuso and Casso reported only modest incomes on their tax returns, and a reasonable jury could have concluded that possession of large amounts of unexplained cash and assets indicated additional illicit sources of income. *United States v. Tramunti*, 513 F.2d 1087, 1105 (2d Cir.), *cert. denied*, 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975); *United States v. Falley*, 489 F.2d 33, 38–39 (2d Cir.1973). The contents of the box were linked to Amuso through D'Arco's and Chiodo's testimony that all money from the Luchese family's racketeering activities were sent to Amuso and Casso in cash, though Amuso ultimately was in charge. Possession of large amounts of cash and the diamond tended to make it "more probable" that Amuso was involved in illegal racketeering activities and that he concealed income from the government. We therefore cannot say that Judge Nickerson acted irrationally or arbitrarily by admitting them into evidence.

### D. *Expert Testimony*

Amuso's final evidentiary challenge relates to evidence offered at trial by FBI special agent Brian Taylor regarding the organization, structure, and terminology of organized crime families. Specifically, Amuso objects to Agent Taylor's testimony about the alleged rule of organized crime that only the boss "can order executions or any execution performed by the family has to have his authority." Amuso challenges this portion of the testimony claiming it was offered "solely to bolster the credibility of the government's fact-witnesses." *See United States v. Cruz*, 981 F.2d 659, 664 (2d Cir.1992).

A district court has broad discretion under Fed.R.Evid. 702 whether to admit expert testimony, and that discretion will be disturbed only if it was manifestly erroneous. *United States v. Skowronski*, 968 F.2d 242, 246 (2d Cir.1992). A district court may commit manifest error by admitting expert testimony where the evidence impermissibly mirrors the testimony offered by fact witnesses, or the subject matter of the expert's testimony is not beyond the ken of the average juror. *See Cruz*, 981 F.2d at 663; *United States v. Castillo*, 924 F.2d 1227, 1232–33 (2d Cir.1991). When the tenor of the expert's testimony is closely aligned with the facts of the case, the testimony may create an improper implication "that a law enforcement specialist ... believes the government's witness[ ] to be credible and the defendant to be guilty." *Cruz*, 981 F.2d at 663.

Agent Taylor's expert testimony was not, however, used exclusively to bolster the government witnesses' versions of the events. *See id.* Agent Taylor testified about a broad range of topics including common cosa nostra terminology necessary to explain tape recorded evidence, and the existence and structure of New York crime families— topics we previously have held to be proper

subjects of expert opinion. *See United States v. Daly,* 842 F.2d 1380, 1388 (2d Cir.), *cert. denied,* 488 U.S. 821, 109 S.Ct. 66, 102 L.Ed.2d 43 (1988). Despite the prevalence of organized crime stories in the news and popular media, these topics remain proper subjects for expert testimony. *United States v. Locascio,* 6 F.3d 924, 936–37 (2d Cir.1993). Aside from the probability that the depiction of organized crime in movies and television is misleading, the fact remains that the operational methods of organized crime families are still beyond the knowledge of the average citizen.

Moreover, although D'Arco's and Chiodo's testimony that Amuso had to authorize all murders overlapped to a degree with Agent Taylor's, this fact alone does not prohibit the expert from also testifying on this subject. *See id.* at 939 ("There is no requirement [in Rule 702] that prohibits a government agent from testifying as an expert merely because an accomplice witness is also available."). Agent Taylor's testimony did not serve simply to bolster the testimony of the government's fact witnesses as to matters readily understood by the average juror. Accordingly, we find no manifest error in Judge Nickerson's decision to admit the expert testimony.

## II. *The Decision to Empanel an Anonymous and Sequestered Jury*

Prior to trial the government moved for an anonymous jury and requested that the jury be sequestered during the course of the trial. In support of its motion, the government argued that an anonymous, sequestered jury was justified by evidence of Amuso's prior attempts to interfere with witnesses and obstruct the criminal process; by the risk that pretrial publicity would interfere with the jury's ability to render a fair and reliable verdict; and by the fact that Amuso, as the alleged boss of the Luchese crime family, clearly had the means to engage in jury tampering. The government therefore asserted that anonymity and sequestration were required to protect the integrity of the trial and to ensure an impartial jury. The district court granted both aspects of the government's motion.

Amuso argues that the district court's decision to empanel an anonymous jury interfered with his ability to conduct *voir dire* and to exercise his peremptory challenges in an effective manner. He also asserts that sequestration hampered his ability to obtain a jury representing a fair cross-section of the community because many jurors would not be available for sequestration during the lengthy trial. He claims that the only justification for the court's order was the invocation of Amuso's alleged mob ties, and that the combined effect of an anonymous and sequestered jury deprived him of due process and his sixth amendment right to an impartial jury.

In deciding whether the district court properly granted a sequestered and anonymous jury, we must balance the defendant's interest in conducting meaningful *voir dire* and in maintaining the presumption of innocence, against the jury member's interest in remaining free from real or threatened violence and the public interest in having the jury render a fair and impartial verdict. *See United States v. Tutino,* 883 F.2d 1125, 1132 (2d Cir.1989), *cert. denied,* 493 U.S. 1081, 110 S.Ct. 1139, 107 L.Ed.2d 1044 (1990); *United States v. Thomas,* 757 F.2d 1359, 1365 (2d Cir.), *cert. denied,* 474 U.S. 819, 106 S.Ct. 66, 88 L.Ed.2d 54 (1985). Recognizing that "[j]ustice requires that when a serious threat to juror safety reasonably is found to exist, precautionary measures must be taken," *Thomas,* 757 F.2d at 1364, we have upheld the use of an anonymous jury where there is "first, strong reason to believe that the jury needs protection and, second, reasonable precaution [is] taken to minimize the effect that such a decision might have on the jurors' opinions of the defendants." *Id.* at 1365.

In this case, the record adequately supports the district court's conclusion that there was reason to believe the jury needed protection. The indictment charged that Amuso was responsible for crimes of extreme violence and, at the same time, was the head of a powerful crime organization. The crimes charged also showed that Amuso was willing to interfere with the judicial process by murdering government witnesses and, as head of the Luchese crime family, it was

certainly reasonable to expect that Amuso had the means to interfere with the jurors if he so desired. *See United States v. Paccione,* 949 F.2d 1183, 1192 (2d Cir.1991), *cert. denied,* — U.S. ——, 112 S.Ct. 3029, 120 L.Ed.2d 900 (1992).

In effectuating its sequestration order, the court told the jury that sequestration was necessary to protect the jury from being tainted by pretrial publicity. By giving the jury a neutral explanation for why sequestration was necessary, the court decreased the probability that the jury would infer that Amuso was guilty or even dangerous, thereby preserving the presumption of innocence. In addition, contrary to Amuso's bald assertion, there is no indication that the jury was drawn from anything other than a fair cross-section of the community.

The trial court's decision was not, as Amuso contends, improperly based on the sole allegation that Amuso was affiliated with organized crime. *See United States v. Vario,* 943 F.2d 236, 240–41 (2d Cir.1991), *cert. denied,* — U.S. ——, 112 S.Ct. 882, 116 L.Ed.2d 786 (1992). Rather, Amuso's alleged organized crime affiliation was considered along with other evidence which provided a reasonable basis from which the trial court concluded that precautionary measures were required. *See Thomas,* 757 F.2d at 1365.

### CONCLUSION

We have examined Amuso's claims and find no reversible error. Accordingly, the judgment of the district court is affirmed.

VAN GRAAFEILAND, Circuit Judge, concurring:

Although I am not convinced that the evidence of Amuso's continued absence was error, my colleagues' treatment of it as harmless error negates the need for an explanation of my thinking. Accordingly, I concur.