# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### November 10, 2009 Session

## STATE OF TENNESSEE v. DANIEL LOPEZ

**Direct Appeal from the Criminal Court for Shelby County**
**No. 06-00684    Lee V. Coffee, Judge**

---

**No. W2008-02572-CCA-R3-CD  - Filed June 11, 2010**

---

The defendant, Daniel Lopez, was convicted of two counts of first degree felony murder and two counts of especially aggravated kidnapping, Class A felonies.  He was sentenced to life for each murder conviction and to twenty-five years for each especially aggravated kidnapping conviction.  The sentences were ordered to run consecutively for a total effective sentence of life plus fifty years.  On appeal, the defendant argues that the trial court erred in: denying his request to give a jury instruction for accomplice testimony; sustaining the State's objection to testimony of a co-defendant; granting the State's motion to have an anonymous jury; denying his motion for a mistrial; and instructing the jury to disregard a question from defense counsel during cross-examination.  After careful review, we affirm the judgments from the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and J.C. MCLIN, JJ., joined.

James E. Thomas (on appeal) and Juni Ganguli (at trial), Memphis, Tennessee, for the appellant, Daniel Lopez.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Senior Counsel; William L. Gibbons, District Attorney General; and David Pritchard and Reginald Henderson, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

This case involves the kidnapping and murder of Taurus Vester and Octavia Nelson by the defendant and his associates after drugs and money were stolen from them.

Glenda Vester testified that she was the mother of Taurus Vester, one of the victims. She said that she last saw her son on a Saturday in January 2005, when he showed her a home that he planned to move in to with the other victim, Octavia Nelson, his fiance. She learned of her son's death on the following Monday, after a telephone call from her other son.

Doris Norfleet testified that she was the mother of Octavia Nelson, one of the victims. She said that she last saw her daughter on a Saturday in January 2005, when her daughter, a beautician, styled her hair. On the following Monday, Norfleet was advised by the sheriff that her daughter's body had been found in the trunk of a car.

Officer Walter Burns of the Memphis Police Department testified that on January 24, 2005, he was called to 1490 Carlton Road in Memphis, Tennessee, regarding a homicide. When he arrived on the scene, he observed a deceased male black in the backseat of a red vehicle, which was located behind a church. When he was sure that the scene was secure, he called for an ambulance and a lieutenant. He stayed until they moved the vehicle back to the crime scene office.

Officer Willie Miles of the Memphis Police Department testified that he was with the Crime Response Unit on January 24, 2005, and that he was responsible for photographing and processing the crime scene of the homicide. At the scene, he observed the vehicle with the body in the backseat. He saw blood on the victim's shirt and what appeared to be brain matter coming from his nostrils. There was glass debris on the front seat that appeared to come from the driver's side window. He also noticed that the victim had duct tape around his hand. When they finished processing the scene, they took the vehicle back to the crime scene office for further investigation.

Officer Miles testified that they opened the trunk of the vehicle and found the body of the second victim, Octavia Nelson, a black female. She appeared to have sustained one gunshot wound to her upper chest. The male victim had multiple wounds. He did not recall finding any shell casings in the car.

The prior testimony of one witness, Andre Adams, was read into evidence.[1] Adams testified that he had once accompanied the victim, Taurus Vester, to a home on Hickory Hill Road, where drugs and money were kept. Adams decided to break in and steal both drugs and money. He had a friend watch the home and, when the residents were gone, he went to the home and kicked down the door. Adams testified that he stole drugs and a safe that contained several pounds of cocaine. He later learned that victim Vester had been killed.

---

[1] The trial transcript reflects that the witness was unavailable to testify because he was in federal custody.

Orel Chapa, testified that he was forced by the defendant to set up the victim, Vester, because he was suspected of having stolen the drugs and money. Chapa was sent drugs from a drug cartel and, in turn, passed them along to another man, Alvin Malone, for sale on the street. The victim and Malone owed money to Chapa for drugs. He testified that he was trying to collect the debt at Malone's house in late December 2004. Malone showed him more than three kilos of cocaine marked with the cartel's symbol and about $10,000 in cash. Chapa was unable to collect his debt and got into a physical fight with Malone. Chapa later told the victim about the drugs and money at Malone's home. He also testified that the drug cartel took his car because he could not collect the debt.

Chapa testified that he was at his mother's home on Willow Road in January 2005 when several Hispanics, including the defendant, Malone, and Cesar Gereo, paid him a visit in a red Envoy. This was the first time that he met the defendant, who was the drug cartel's agent. The armed men were searching for drugs and money that had been stolen from Malone's home. Malone threatened to kill him, but the defendant stopped him. He was taken to Malone's home while the other men were left to guard his mother. He believed the defendant did not want him killed because they needed to investigate the theft. He testified that he thought the victim might have been responsible for the theft because of a prior conversation he had with the victim. He was forced to phone the victim to inquire about buying cocaine from him. He went to the victim's home and purchased the drugs. The defendant released him but advised him not to leave the city.

Chapa was later told to phone the victim and ask him to come to his house to sell more cocaine. He testified that he followed through on the telephone call because he was frightened for his family and himself. Both victims arrived at his home, but the attack did not begin until Malone arrived. The victim was ordered to the ground by the defendant and Malone, who pointed weapons at him. The victim was a large person and was unable to put his hands behind his back. His hands were put in front of him and wrapped with duct tape.

Chapa testified that he was ordered by the defendant to get the female victim from the car. She would not open the door so he grabbed a pipe and smashed the driver's side window. The defendant came out, grabbed the pipe, and broke the other window. The defendant and Malone dragged her inside. Chapa said the defendant ordered him to move his automobile closer to the house and to move the victim's car. They all got in an automobile and left Chapa's home. He heard fighting and gunshots and turned to see the defendant and Malone shooting the male victim. He was directed to drive to a body shop on Elvis Presley Boulevard and when they arrived, he was told to exit the vehicle. He heard several more shots and saw the defendant and other men exit the vehicle. Malone drove them to the defendant's apartment. He did not know how the victims ended up in the Oldsmobile.

Chapa testified that he and his mother fled to Texas where he was eventually arrested for the crime. He identified the defendant as the perpetrator of the crimes in a photographic lineup.

Commander Paul Feist testified that he was a member of the Albuquerque Police Department and was in charge of their crime lab. He was qualified as an expert in the field of crime scene reproduction. He testified that he received a request from investigators in Tennessee to assist in the investigation of a double homicide. He was asked to process the defendant's maroon Envoy automobile that had been purchased by a resident of Albuquerque. The owner brought the vehicle to the crime lab. The vehicle appeared to be very clean and well maintained. There was no obvious damage, but he did notice some type of stitching difference in the back of the front passenger seat. Upon unstitching the seat, it appeared the seat had a defect in the upper left rear shoulder area. He opined that it was consistent with a gunshot being fired at a close range. The defect tested positive for the presence of lead. The foam also had a second defect, and they used a trajectory rod to reveal that the two defects were connected. He testified that he could not say definitively that the defects were the result of a bullet, but the trajectory test and presence of lead were consistent with a conclusion that a bullet had been fired from the back seat. He further opined that some type of cleaning agent had been used in the vehicle.

Commander Feist testified that a defect was found on a second row of seats but did not test positive for lead even though the trajectory rod matched up the defects. He reiterated that he could not say definitively what caused the defects.

Officer Freddie Romero testified that he knew that drug cartels would react with violence, including murder, when the cartel did not get paid promptly or when drugs went missing.

Maria Aguero, Chapa's mother, corroborated her son's testimony regarding the defendant's visit to her home. She testified that the armed men came to her home and blamed him for the theft of the drugs and money. She identified the defendant as the leader of the group who ordered the others to search her home for drugs and money. She testified that when Malone arrived, he put a gun to her son's head and said that he should be killed. The defendant took her son by the neck and took him outside. She denied that she previously told police that the defendant was unarmed. During her testimony, Ms. Aguero asked the defendant to stop looking at her with "that ironic smile."

Carla Tellez testified that she was a friend of Cesar Gereo and that she knew the defendant. She overheard the defendant and Gereo talking in January 2005, about some missing merchandise and about the involvement of Chapa. They said that Chapa and his mother would have to "pay the consequences." She later saw Gereo limping from a bullet

wound. She identified a photograph of a red Envoy automobile driven by the defendant at the time of the murders. The defendant asked her to drive it to El Paso, Texas, but she refused when she saw the backseat with blood and bullet holes. The defendant arranged for two of Tellez's friends to drive the automobile to Texas. When they returned, the defendant threatened all their lives if they left the area. She acknowledged that she lied to police about the defendant but said that she would have been harmed if she told the truth.

Officer Ricky Davidson testified that his investigation at Chapa's house turned up a piece of duct tape on the floor, a roll of tape on the television, blood on the hallway door frame, broken safety glass and shell casings in the driveway, and a necklace.

Dr. Kenneth Snell, a medical examiner, testified that the male victim had four gunshot wounds. The first was a chest wound that entered his right upper chest and exited his right shoulder. A second gunshot to his chest skirted his skin before entering his body. The third wound was also to his chest, and the fourth was to his abdomen. All the gunshot wounds came from his left side and went from front to back. He opined that the wounds would have caused severe bleeding and would have rendered the victim unconscious in approximately thirty seconds. The medical examiner testified that the female victim died of a single gunshot wound to her chest and that they were sustained from the left, front side.

The defendant called Kelvin Malone, the brother of Alvin Malone, to testify on his behalf. He testified that he met with his brother on the morning of January 23, 2005, to borrow some money. His brother received a phone call while he was with him, and he could tell that his brother was angry. His brother asked him to ride somewhere with him, and he agreed. They went to a home where a red Envoy automobile was parked in the driveway. His brother ran toward the house, and four or five Hispanic men jumped out of the Envoy. He testified that the defendant was not one of the men he saw at the house. On cross-examination, he testified that he did not get a good look at the men running from the Envoy.

The defendant was convicted of two counts of first degree felony murder and two counts of especially aggravated kidnapping. He was sentenced to life on each murder conviction and two twenty-five-year sentences on each of the kidnapping convictions, with all of the sentences to be served consecutively.

Analysis

On appeal, the defendant argues that the trial court erred by not charging the jury that Orel Chapa was an accomplice as a matter of law pursuant to Tennessee Code Annotated section 40-18-110. The trial court denied the request and, instead, gave the accomplice instruction that requires the jury to determine if Chapa was, in fact, an accomplice. An

accomplice is a person who knowingly, voluntarily, and with a common intent unites with the principal offender in the commission of a crime. *State v. Allen*, 976 S.W.2d 661, 666 (Tenn. Crim. App. 1997). Uncorroborated testimony of an accomplice-witness will not support a conviction. *State v. Bane*, 57 S.W.3d 411, 419 (Tenn. 2001). Corroborating evidence is evidence entirely independent of the accomplice's testimony which, taken by itself, leads to the inference not only that a crime has been committed but, also, that the defendant was implicated in it. *State v. Bigbee*, 885 S.W.2d 797, 803 (Tenn. 1994). The independent corroborative testimony must include some fact or circumstance that affects the defendant's identity. *State v. Boxley*, 76 S.W.3d 381, 387 (Tenn. Crim. App. 2001). In *Bethany v. State*, this court stated:

> The question of who determines whether a person is an accomplice depends upon the facts of each case. When the facts of a witness' participation in a crime are clear and undisputed, it is a question of law for the court to decide. When such facts are in dispute or susceptible of an inference that a witness may or may not be an accomplice, it then becomes a question of fact for the jury to decide.

565 S.W.2d 900, 903 (Tenn. Crim. App. 1978); *State v. Lawson*, 794 S.W.2d 363, 369 (Tenn. Crim. App. 1990).

Here, Chapa was indicted as a co-defendant. However, he contended that the defendant threatened his life and that he only acted under duress. If the witness's participation in the crime is the result of force, coercion, duress, or undue influence so that the participant does not act voluntarily with the same intent as the principal, then the witness is not an accomplice. *Henley v. State*, 489 S.W.2d 53 (Tenn. Crim. App. 1972); *State v. Green*, 915 S.W.2d 827 (Tenn. Crim. App. 1995). The facts of the witness's participation were disputed, and the trial court properly declined to instruct the jury that Chapa was an accomplice.

Even if the failure to issue the instruction was error, it was harmless. There was more than sufficient corroboration of the witness's testimony. Maria Aguero corroborated the witness's testimony when she testified that the defendant and his friends came to her home, that they were armed, and that they blamed Chapa for the theft of the drugs and money. She further testified that a man put a gun to Chapa's head and threatened to kill him. Another witness testified that the defendant tried to force her to drive the automobile, in which the victims were murdered, to Texas, but she refused when she saw the interior was riddled with bullets and covered in blood. Testimony was elicited at trial from an expert in crime scene reproduction who analyzed the defendant's automobile. He opined that the seat cushions had defects in them consistent with bullets having passed through them. A Memphis police

officer also testified that he found duct tape and blood in Chapa's home and broken glass in his driveway, consistent with the condition of the male victim's car. In light of the overwhelming corroborating evidence supporting Chapa's testimony, any error in permitting the jury to conclude whether the witness was an accomplice was harmless.

Next, the defendant argues that the trial court erred in sustaining the State's objection during Kelvin Malone's testimony as to statements made by Alvin Malone, his brother and a co-defendant in the case. The defendant did not make an offer of proof regarding the proposed testimony of the witness. The witness testified that he knew the defendant and that he did not see the defendant get out of the Envoy automobile or later at his brother's auto shop. He was then asked about a phone call that he received from his brother. The State objected to hearsay. The defendant contended that the statements of Alvin Malone constituted party admission. The trial court concluded that unless the statements were against Alvin Malone's interests, they would constitute inadmissible hearsay pursuant to Tennessee Rule of Evidence 804(b)(3).

Pursuant to Tennessee Rule of Evidence 803(1.2)(E), a hearsay statement is allowed against a party when, among other things, it is an admission by the party, a statement against interest, or a statement made "by a co-conspirator of a party during the course of and in furtherance of the conspiracy." The key to this rule is that the proof must be offered against the party who made the statement. Here, the statement was offered in support of the defendant and was properly excluded by the trial court.

Next, the defendant argues that the trial court erred in granting the State's motion for an anonymous jury. In *State v. Ivy*, 188 S.W.3d 132, 143 (Tenn. 2006), the Tennessee supreme court acknowledged that the impaneling of an anonymous jury "requires a court to 'balance the defendant's interest in conducting meaningful voir dire and in maintaining the presumption of innocence, against the jury member's interest in remaining free from real or threatened violence and the public interest in having the jury render a fair and impartial verdict.'" *Id.* at 144 (quoting *United States v. Amuso*, 21 F.3d 1251, 1264 (2d Cir. 1994)). A two-prong test was adopted for use by other courts in determining the appropriateness of an anonymous jury in any particular case: first, whether there is a strong reason to believe that the jury needs protection; and second, whether reasonable precautions will minimize prejudice to the defendant and ensure that fundamental rights are protected. *Id.*

In determining whether the circumstances support a finding that the jury needs protection, a court may consider a defendant's alleged participation in organized crime, a defendant's alleged participation in a group with the capacity to threaten jurors, a defendant's past efforts to interfere with the judicial process, the defendant's possible punishment if convicted, and the pervasiveness of trial publicity that may reveal the jurors' names and

expose them to public scrutiny. *Id*. Reasonable precautions to minimize prejudice to the accused include enhanced voir dire, instructions to the jury as to neutral reasons for their anonymity, and instructions to the jury on the presumption of innocence.

The State filed a motion prior to trial, requesting an anonymous jury. The motion relied on the *Ivy* factors and stated that the defendant was a member of the Juarez drug cartel and had admitted in federal court that he was a courier for them. The motion further stated that numerous police officers had been murdered during drug wars involving the Juarez cartel and that several witnesses were reluctant to testify. The motion also stated that the Assistant United States Attorney, who had prosecuted another case involving the Juarez cartel, had been threatened. The defendant was facing multiple life sentences if he was convicted, and the trial of the co-defendant, Malone, had generated considerable press coverage. The trial court conducted a hearing on the motion, and the State reiterated the reasons in the motion for impaneling an anonymous jury. The defendant argued that sequestration was sufficient to provide safety and that the defendant, who was only a courier for the cartel, demonstrated his cooperation in federal court. The trial court granted the motion for an anonymous jury based on the reasoning set forth in the State's motion. The trial court found that the defendant or those associated with him had made threats against the State's witnesses.

Here, the defendant contends that the trial court abused its discretion and argues that he was prejudiced by the "unnecessary security precautions" because the extra safety measures would only cause jurors to speculate as to why they were impaneled anonymously. He also argues that the trial court based its ruling on the statements of the prosecution and on the court's knowledge of the cartel rather than on any real evidence. The State argues that the use of an anonymous jury in *Ivy* was based solely on the State's assertions. *Ivy*, 188 S.W.3d at 143. The Tennessee Supreme court also relied on *United States v. Edmond*, 52 F.3d 1080, 1090 (D.C. Cir. 1995), which held that appellate review must be deferential to the trial judge who is in a more familiar position to determine the "local ambiance."

With regard to the second prong of the test, the trial court took reasonable precautions to advise the jury through enhanced instructions to neutralize any possible prejudice. The jury was specifically advised not to allow the condition of their anonymity to affect their determination of guilt because their identities were not relevant to any factual issue with regard to the defendant. The trial court instructed the jury as follows:

> The Court has impaneled an anonymous jury in this trial for legal reasons. The Court instructs you that the preservation of the jurors' personal information shall in no way affect your determination of the guilt or innocence of the defendant. The Court has determined that jurors' names, addresses and

employment locations are not relevant to any factual issues that are of consequence to the determination of the guilt or innocence of this defendant.

You shall not consider the impaneling of an anonymous jury for any purposes against the defendant, nor can any inferences be drawn from the Court's decision to keep jurors' names and identities in confidence. The defendant is presumed innocent and the burden is on the state to prove his guilt beyond a reasonable doubt.

To ensure a fair trial for the defendant and the State of Tennessee, you must not be offended, bothered or influenced by the anonymous jury selection process. The law is complex and contains many rules that the Court must follow. Please do not hold the impaneling of an unidentified jury against any party in this case.

In sequestered jury trials for certain homicide prosecutions and other cases which have received extensive pre-trial publicity, it is a common practice to keep jurors' personal information unrevealed.

The trial court also gave the defendant an opportunity to add additional language to the enhanced instructions, but the defendant informed the trial court that he was satisfied with the instructions as given. The defendant has not demonstrated that he was prejudiced by the enhanced security measures or that there was an insufficient basis for the trial court to impanel an anonymous jury.

Next, the defendant argues that the trial court erred in denying his request for a mistrial after a witness asked the court to instruct the defendant to stop looking at her with "that ironic smile." The transcript of the record does not show a request by the defendant for a mistrial. The trial court instructed counsel to advise the defendant against making inappropriate glances toward the witness. The trial court conducted a bench conference, out of the hearing of the jury, in which the defendant's counsel complained about the trial court's remarks and insisted that the defendant had a right to confront the witnesses against him. An attorney for the State said that he had seen the defendant behave inappropriately but chose not to comment during the direct examination of the witness. The trial court stated that it had not accused the defendant of acting inappropriately in front of the jury but had only asked counsel to remind the defendant that he was to refrain from any inappropriate gestures.

Tennessee Rule of Appellate Procedure 36(a) advises that failure to object, request a curative instruction, or move for a mistrial is typically grounds for waiver of an issue on appeal. *State v. Walker*, 910 S.W.2d 381, 386 (Tenn. 1995). The record is void of any

request for a mistrial; therefore, this issue would be properly waived. However, we conclude that the defendant was not entitled to a mistrial, even if the request had been made. The determination of whether to grant a mistrial rests within the sound discretion of the trial court. *State v. Smith*, 871 S.W.2d 667, 672 (Tenn. 1994). The reviewing court should not overturn that decision absent an abuse of discretion. *State v. Reid*, 91 S.W.3d 247, 279 (Tenn. 2002). The burden of establishing the necessity for mistrial lies with the party seeking the mistrial. *State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996). No abstract formula should be mechanically applied in making this determination, and all circumstances should be taken into account. *State v. Mounce*, 859 S.W.2d 319, 322 (Tenn. 1993). In the instant case, there is no decision by the trial court to review because there was no motion was made for a mistrial.

When determining whether a mistrial is necessary because inappropriate testimony was presented to the jury, this court considers the following non-exclusive factors: "(1) whether the State elicited the testimony; (2) whether the trial court gave a curative instruction; and (3) the relative strength or weakness of the state's proof." *State v. Lawrence Taylor*, No. W2002-00183-CCA-R3-CD, 2003 Tenn. Crim. App. LEXIS114, at *11 (Tenn. Crim. App. at Jackson, Feb 14, 2003). Here, the complained of testimony was precipitated by the defendant's actions and was not elicited by the State. The trial court did not give a curative instruction nor did the defendant request one. The State's proof was relatively strong, and the proof against the defendant was substantial. The record reflects that even if the defendant had requested a mistrial, granting it was unnecessary. The defendant is not entitled to relief on this issue.

Next, the defendant argues that the trial court erred in telling the jury to disregard his question to witness Chapa: "Do you get kidnapped a lot?" The question was in response to the witness's prior testimony regarding the date of the kidnapping. The propriety, scope, manner, and control of the cross-examination of witnesses rest within the discretion of the trial court. *Coffee v. State*, 216 S.W.2d 702, 702 (1948); *Davis v. State*, 212 S.W.2d 374, 375 (1948). Appellate courts may not disturb limits on cross-examination except when there has been an unreasonable restriction on the right. *State v. Fowler*, 373 S.W.2d 460, 466 (1963); *State v. Johnson*, 670 S.W.2d 634, 636 (Tenn. Crim. App. 1984).

While questioning the witness on cross-examination, counsel for the defendant asked about his prior testimony regarding the dates of the kidnapping. The witness had previously testified that the kidnapping occurred on January 17, and then testified at trial that it occurred on January 21. Counsel for the defendant asked, "Do you get kidnapped a lot?" and the State objected. The trial court sustained the objection and ordered the jury to disregard the question. The witness believed he was being accused of perjury and asked to consult with his lawyer. While the jury was out, the trial court cautioned the defendant's counsel about

asking argumentative questions. The record does not reflect that the defendant objected to the trial court's sustaining of the State's objection or offer an explanation as to why the question was not argumentative. Therefore, this issue is waived pursuant to Tennessee Rule of Appellate Procedure 36(a).

Conclusion

Based on the foregoing and the record as a whole, we affirm the judgments from the trial court.

_____
JOHN EVERETT WILLIAMS, JUDGE