**UNITED STATES of America,
Appellee,**

v.

**Alaa AL–SADAWI, Defendant–
Appellant.**

**Docket No. 03–1784.**

United States Court of Appeals,
Second Circuit.

Argued: March 3, 2005.

Decided: Dec. 23, 2005.

Tracy Lee Dayton, Assistant United States Attorney for Roslynn R. Mauskopf United States Attorney, Eastern District of New York, Emily Berger, Ruth Nordernbrook, Assistant United States Attorneys, of counsel, for Appellee United States.

William M. Bloss, Koskoff, Koskoff & Bieder, P.C., Bridgeport, CT, for Defendant-Appellant Alaa Al–Sadawi.

Before: WALKER, Chief Judge, CARDAMONE, B.D. PARKER, Circuit Judges.

B.D. PARKER, JR., Circuit Judge.

Alaa Al–Sadawi appeals from a judgment of conviction in the United States District Court for the Eastern District of New York (Garaufis, *J.*) on charges of currency violations and conspiracy.[1] On appeal, Al–Sadawi principally challenges two evidentiary rulings by the District Court as well as his sentence. We affirm the conviction, finding the evidentiary errors to have been harmless. However, we remand to the District Court to determine whether to resentence in accordance with *United States v. Crosby,* 397 F.3d 103 (2d Cir.2005) and *United States v. Booker,* 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005).

## BACKGROUND

The prosecution underlying this appeal arose from Alaa Al–Sadawi and his co-defendant Abdel Moniem Soliman's attempts to smuggle $659,000 in United States currency to Egypt through John F. Kennedy International Airport in the luggage of Al–Sadawi's parents, Hassan and Afaf Al–Sadawi. Al–Sadawi, his father Hassan, and Soliman were indicted in July 2002. Soliman eventually pled guilty, while Al–Sadawi and his father went to trial where Al–Sadawi was convicted and his father was acquitted.

The facts adduced at trial reflect that during an investigation of currency transactions, the government intercepted a series of phone calls between Al–Sadawi and Soliman pursuant to a wiretap authorized in December 2001. In these calls the two men discussed the consolidation and packaging of currency to be taken out of the United States by Al–Sadawi's parents. At trial, the government established that when discussing their plans, the two men relied on thinly disguised code, using terms such as "the benefit" and "the job" and referring to the actual money as "the shirts."[2] They discussed the need to be

---

**1.** Al–Sadawi was convicted of (1) conspiracy to fail to file an accurate currency report in violation of 18 U.S.C. § 371, 31 U.S.C. § 5316(a)(1)(A); (2) aiding and abetting transportation of more than $10,000 outside the United States without filing an accurate report in violation of 18 U.S.C. § 2, 31 U.S.C. §§ 5316(a)(1)(A) and (b), and 5322(b); and (3) aiding and abetting the concealment of more than $10,000 and attempting to transfer that currency outside the United States in violation of 31 U.S.C. § 5332(a).

**2.** This code was particularly transparent because it was used inconsistently. For example, at one point, when discussing the bag with "the shirts," Soliman told Al–Sadawi, "I was surprised that most of it was in small change. . . . I keep on consolidating the currencies now." Transcript of an April 25, 2002 telephone conversation (translated from the original Arabic).

covert about their activities, with Soliman, for example, telling Al–Sadawi that he would keep his distance from Al–Sadawi prior to the day they would smuggle the currency: "I will neither be tied to you, nor to a suitcase, not even packing suitcases. And I will not come to you in Jersey." "Correct," Al–Sadawi replied. "I'll meet with you at the last minute. I can even meet with you at the airport," Soliman told Al–Sadawi. Al–Sadawi urged Soliman to be speedy, telling him: "[T]he important thing is that you finish the folding of the shirts and the pants and these things as much as you can."

In one conversation, Al–Sadawi suggested that they contact a person who had consolidated money for Al–Sadawi on previous occasions. Al–Sadawi told Soliman: "[I]f you need help from Waleed ... He does it for me." In another conversation, Al–Sadawi asked Soliman, "were you successful in your shirts mission?" Soliman replied, "[i]t was a fifty-fifty success." On April 28, 2002, Soliman telephoned Al–Sadawi to advise that he was "done with everything according to [their] arrangements" and to tell him "we will prepare a suitcase, one that I'll buy myself, so I don't tie myself with you. And I can meet with you at the airport ...." In a conversation the next day, the two men discussed the weight and size of the suitcase. In another, Soliman asked, and Al–Sadawi agreed, to delay Al–Sadawi's parents' return to Egypt to give Soliman more time to complete the considerable task of packaging a large amount of currency.

Based on these and other intercepted conversations, the FBI and the United States Customs Service ("USCS") learned that Al–Sadawi's parents planned to depart for Egypt on April 30, 2002, and the authorities decided to conduct visual and video surveillance at Kennedy Airport. The government observed Al–Sadawi entering the terminal pushing a luggage cart

containing a number of suitcases. On top of the cart there was a large black suitcase with yellow handles. In the line at the Egypt Airlines counter, the Al–Sadawi family was joined by Soliman and another associate. Al–Sadawi walked his parents to the security checkpoint.

When Al–Sadawi's parents attempted to board their flight, they were intercepted and interviewed by a USCS inspector, accompanied by an Arabic translator. When questioned, they told the inspector that they were carrying approximately $1,200. However, when their luggage was searched, a total of $659,000 in U.S. currency was recovered from the black suitcase. The money was concealed within two boxes of baby wipes, a box of Ritz crackers, and a box of Quaker Oats. Once informed that they would not be able to board their plane, Hassan turned to Afaf with the familiar parental lament: "[I]t's your son that got us into this trouble."

They were escorted to an office to be interviewed. There Hassan told Customs officials that the suitcase belonged to Soliman, and that Soliman was their son's friend. At the agents' request, Hassan made a monitored and recorded telephone call to Soliman. Hassan asked Soliman, "The suitcase, does it have anything?" to which Soliman replied, "No [Hassan]. There is nothing in it, only the money." Soliman then called Al–Sadawi and the two devised a cover story, which was also captured by the wiretap. Al–Sadawi told Soliman to find out what Hassan had told the Customs officials: "Is he going to tell them that we knew about that or that we didn't? So our statements do not differ than his, did we know about this or we did not?" "How do you want to direct it if they did not know?" Soliman asked Al–Sadawi. "You told us that you want to send this suitcase and that it contains clothing .... [t]hat is the story." Al–

Sadawi responded. Hassan then placed a second consensually recorded call to Soliman. Hassan asked if Soliman had spoken to Al–Sadawi, and Soliman replied: "Yes, I told him, but I beg you not to mention him in anything." Later, when Soliman arrived at the airport, Hassan was wearing a body-recording device, permitting the FBI to hear Soliman tell him that the two of them "need[ed] [their] statements to be the same." Hassan also called Al–Sadawi, and that conversation was captured by the wiretap. Al–Sadawi told his father, "[Soliman] gave you the suitcase and it contains clothes only. You only know that."

Soliman was arrested at the airport. Subsequently, he pled guilty to conspiracy to export monetary instruments without filing a required report. The FBI continued to investigate Al–Sadawi's involvement in the money transfer operation. In July 2002, Al–Sadawi complied with a grand jury subpoena for fingerprints, photographs and handwriting exemplars. Al–Sadawi was arrested on July 16. The arrest was triggered by the fact that, as a consequence of its surveillance of Ibtissam Chadid, Al–Sadawi's wife, the government had concluded that Al–Sadawi was intending to flee the country.

At trial, the government established its case primarily through the extensive wiretap and surveillance evidence. Secondarily, the government introduced evidence of Al–Sadawi's wife's travel plans to show his attempted flight as indicative of his consciousness of guilt. That evidence showed that on July 11 and July 15 she had been recorded calling various United States passport offices seeking an appointment to obtain passports on an expedited basis. A few days earlier, Al–Sadawi and his wife had both become naturalized United States citizens. At the time, both had valid Egyptian passports which would have permitted them to travel outside the country. Two tickets had been issued in their names on a Delta Airlines flight from JFK Airport to Cairo, departing on July 15. No tickets were obtained for the couple's four children. The District Court admitted this evidence over Al–Sadawi's objection and with an appropriate limiting instruction. The propriety of admitting this evidence is a principal issue on this appeal.

At trial the government also read to the jury, again over Al–Sadawi's objection, a redacted portion of Soliman's plea allocution. The jury heard admissions by Soliman that he failed to declare more than $10,000 when sending money from the United States to a place outside the United States, that he had arranged for the money to be sent with a parent of one of his friends, and that the money was being sent from JFK Airport. The District Court instructed the jury that the plea allocution was admitted "for the limited purpose of establishing the existence of the conspiracy" and "not for the purpose of inculpating" Al–Sadawi.

Al–Sadawi's defense included testimony from his attorney, Steven M. Bernstein Esq., who had represented Al–Sadawi in connection with his grand jury subpoena. Bernstein testified that he had advised Al–Sadawi that since he was an American citizen, he was eligible for an American passport and should apply for one.

At the conclusion of the trial, Al–Sadawi was convicted on all counts and his father was acquitted. The District Court enhanced Al–Sadawi's sentence by fourteen levels based on the amount of money he attempted to smuggle and by two levels as a consequence of the fact that, in securing his parents' assistance, he supervised others. *See* U.S.S.G. §§ 1B1.3(a)(1)(A), 3B1.1(c). Al–Sadawi was sentenced principally to sixty-three months imprisonment. This appeal followed.

## DISCUSSION

Al–Sadawi's principal contention on appeal is that two significant evidentiary errors by the District Court infected his trial. First, it erred in admitting evidence of his wife's attempts to obtain United States passports and airline tickets to show her husband's intention to flee. Secondly, it erred in admitting portions of Soliman's plea allocution in violation of *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

A district court's decision to admit flight evidence is reviewed for abuse of discretion. *See United States v. Amuso*, 21 F.3d 1251, 1258 (2d Cir.1994). It is well-settled that flight can, in some circumstances, evidence consciousness of guilt. *United States v. Glenn*, 312 F.3d 58, 67 (2d Cir.2002); *United States v. Salameh*, 152 F.3d 88, 157 (2d Cir.1998) (per curiam). However, before a court may instruct a jury regarding flight, a satisfactory factual predicate must exist from which the jury can infer consciousness of guilt from flight. *See Amuso*, 21 F.3d at 1260; *United States v. Sanchez*, 790 F.2d 245, 252 (2d Cir.1986). Since flight evidence can be powerful, the requirement of a sufficient factual predicate "ensures that the evidence is probative in a legal sense and protects the defendant against the possibility of the jury drawing unsupported inferences from otherwise innocuous behavior." *Amuso*, 21 F.3d at 1260.

Flight is an admission by conduct. *United States v. Lobo*, 516 F.2d 883, 885 n. 1 (2d Cir.1975) (per curiam) (Flight "is to be viewed as conduct offered as circumstantial evidence rather than for its assertive, testimonial value"). "Its probative value as circumstantial evidence of guilt depends upon the degree of confidence with which four inferences can be drawn: (1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged." *United States v. Myers*, 550 F.2d 1036, 1049 (5th Cir.1977); *United States v. Beahm*, 664 F.2d 414, 420 (4th Cir.1981) ("If the government wishes to offer evidence of flight to demonstrate guilt, it must ensure that each link in the chain of inferences leading to that conclusion is sturdily supported.") (citing *Myers*, 550 F.2d at 1049); *see also* 1 NEW WIGMORE EVID. § 1.3 (Leonard Rev. 2000).

For Al–Sadawi, the chain of inferences never proceeds beyond the first of these four steps. The government's flight evidence showed that his wife attempted to obtain United States passports and airline tickets but that evidence failed to connect Al–Sadawi with those plans. The government's theory was that he and his wife were co-conspirators in their flight plans. But this proposition was not proved. While it may be possible that Al–Sadawi instructed his wife to obtain a different passport and purchase tickets to assist him to flee prosecution, this was not demonstrated and we have cautioned that the flight evidence "must . . . provide the jury with more than an opportunity for mere 'conjecture and speculation'." *Sanchez*, 790 F.2d at 252 (quoting *Myers*, 550 F.2d at 1050). The government's theory that its evidence demonstrated Al–Sadawi's intention to flee was problematic for a number of reasons. First, Al–Sadawi had a valid Egyptian passport on which he, presumably, was free to travel at any point. Secondly, he had known for at least six months that he had been the subject of government surveillance, that the government had seized the currency he intended to smuggle and that he had been directly implicated in this activity. Yet during this period he did nothing consistent with an

intention to flee. Thirdly, although Al–Sadawi was arrested an hour before the ticketed flight was scheduled to depart, no evidence was presented that he had bags packed, had tickets in his possession or was on the way to the airport when he was arrested. *See United States v. Silverman*, 861 F.2d 571, 582 n. 4 (9th Cir.1988) ("Evidence that a defendant fled immediately after a crime was committed supports an inference that the flight was motivated by a consciousness of guilt of *that* crime. As the time between the commission of the offense and the flight grows longer, the inference grows weaker.") (emphasis in the original) (citing *Myers*, 550 F.2d at 1051).

These circumstances differ sharply from those we considered in *Salameh*. There, we held that the jury could have inferred consciousness of guilt where the defendant in a bombing prosecution actually left the country the day after the bombing. *Salameh*, 152 F.3d at 157. In *Salameh*, the defendant's intention to flee was incontrovertible because he actually did travel. The timing and the circumstances of that travel—a one-way ticket out of the country, no luggage, leaving his family behind—combined to permit the jury reasonably to infer the defendant's consciousness of guilt. *Id.* Here, by contrast, Al–Sadawi had known for many months that he was heavily implicated in currency smuggling yet the government adduced no evidence that he attempted to flee during this period. Under these circumstances, his wife's efforts to obtain tickets and passports were, without more, too attenuated to establish that he intended to flee to avoid prosecution or apprehension. With so thin an evidentiary reed, the government should not have been permitted to argue that his wife's conduct evidenced his consciousness of guilt.

█ But given the overwhelming strength of the evidence against Al–Sadawi, and the limiting instruction by the court on flight evidence, we find its admission to have been harmless. *See, e.g., United States v. Lewter*, 402 F.3d 319, 323 (2d Cir.2005). The government's case against Al–Sadawi was strong. By far the most damaging testimony against him came from the recorded conversations which provided an adequate factual predicate on which the jury could conclude that he was deeply involved in the planning and execution of the crimes for which he was convicted. Those conversations documented Al–Sadawi and Soliman's coordinated efforts to use Al–Sadawi's parents to hide and to smuggle the currency, to delay the trip until the currency could be properly consolidated, to use a contact who had previously helped Al–Sadawi consolidate currency, and then, once they realized their plan was exposed, to develop a cover story. The jury also saw surveillance evidence collected by the agents at the airport, showing Al–Sadawi himself carrying the suitcase in which the money was smuggled and accompanying his parents to the security checkpoint. The jury also heard evidence that Al–Sadawi's father blamed Al–Sadawi for preventing him from taking his flight. The jury was given an appropriate instruction concerning the flight evidence, and we must presume that it followed the instruction. *United States v. Downing*, 297 F.3d 52, 59 (2d Cir.2002). In light of all these factors, we conclude that the admission of this evidence did not contribute to the verdict.

█ The second evidentiary error urged on appeal is that the District Court should not have permitted portions of Soliman's plea allocution to be read to the jury. After Al–Sadawi's trial, the Supreme Court held in *Crawford* that the Confrontation Clause bars the admission of out-of-court testimonial statements made by an unavailable declarant not subject to cross-examination. *Crawford*, 541 U.S. at 68–69,

124 S.Ct. 1354. In light of this intervening development, the government concedes that the admission of the allocution violated *Crawford* but, citing *United States v. McClain*, 377 F.3d 219 (2d Cir.2004), contends-correctly-that the admission is subject to harmless error analysis. *Id.* at 220.

Like the admission of the flight evidence, we conclude that this error was also harmless. In *McClain*, we concluded that a *Crawford* error is harmless if "the government can show beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." 377 F.3d at 222 (internal quotation omitted). In *Zappulla v. New York*, 391 F.3d 462, 468 (2d Cir.2004), we observed that "the Supreme Court has found the following factors to be relevant in determining whether the erroneous admission of a confession was harmless error (1) the overall strength of the prosecution's case; (2) the prosecutor's conduct with respect to the improperly admitted evidence; (3) the importance of the wrongly admitted testimony; and (4) whether such evidence was cumulative of other properly admitted evidence."

■ Each of these factors leads us to conclude that the error in the admission of Soliman's allocution was harmless. As previously discussed, the government's case was strong. The statements from Soliman's plea allocution were essentially cumulative of the properly admitted transcripts and surveillance evidence that supplied powerful evidence of Al–Sadawi's guilt. Moreover, the introduction of the allocution was the subject of an appropriate limiting instruction. While the government adverted to the allocution in closing arguments, the reference was brief and was subsumed in discussions of the contents of the intercepted conversations and the surveillance evidence. Viewing the record in its entirety, we conclude that the admission of the allocution does not erode our confidence that the properly admitted evidence established Al–Sadawi's guilt beyond a reasonable doubt.[3]

Finally, Al–Sadawi attacks his sentence principally on the basis of two enhancements. The District Court added two levels pursuant to U.S.S.G. § 3B1.1 (c) because "[t]he defendant recruited his parents to participate in the crime and delayed their travel to assist Soliman in preparing the money for transfer." Section 3B1.1 provides that "[i]f the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than that described in (a) and (b) [involving five or more people], increase by 2 levels." For the enhancement to apply, a defendant need only have been "the organizer, leader, manager, or supervisor of one or more other participants." U.S.S.G. § 3B1.1 cmt. 2.

■ Al–Sadawi argues that the government did not meet its burden of showing that he supervised criminally culpable persons since his mother was not charged and his father was acquitted. However, the definition of "participant" in U.S.S.G. § 3B1.1 makes clear that such a person need not have been convicted. Furthermore, evidence of a defendant's direct and immediate control over other participants provides strong support for a role enhancement. "A defendant may properly be considered a manager or supervisor if he 'exercise[d] some degree of control over others involved in the commission of the offense ... or play[ed] a significant role in

---

3. AlSadawi also argues that the District Court ought not to have admitted the plea transcript when it refused to admit statements by Soliman that exculpated Al–Sadawi. Again, in light of the other overwhelming evidence that

Al–Sadawi was actively participating in the conspiracy, the District Court's decision to exclude Soliman's post-arrest statements—which were not made under oath—was not an abuse of discretion.

the decision to recruit or to supervise lower-level participants.' " *United States v. Blount,* 291 F.3d 201, 217 (2d Cir.2002) (alterations in original) (quoting *Ellerby v. United States,* 187 F.3d 257, 259 (2d Cir. 1998) (per curiam)). Indeed, it is enough to manage or supervise a single other participant. *United States v. Payne,* 63 F.3d 1200, 1212 (2d Cir.1995).

The District Court's conclusion that Al–Sadawi recruited his parents into the conspiracy is well-grounded in the record. The father's reaction to being detained at the airport was not one of surprise, as would be expected if he had no knowledge of the plot, but, on the contrary, was clearly indicative of knowledge of criminal activity. Furthermore, Al–Sadawi's discussion with Soliman upon learning of his father's arrest in which Al–Sadawi voiced his concern that his father would tell the agents what he knew about the smuggling operation supplied the court below with a powerful additional indication of his father's involvement. Since the two-point role enhancement would have been justified upon Al–Sadawi's recruitment of his father alone, the court was justified in imposing it. *See* U.S.S.G. § 3B1.1(c).

The District Court held Al–Sadawi responsible pursuant to U.S.S.G. § 1B1.3(a)(1)(A) for the total amount of funds ($659,000) that he and his co-conspirators attempted to export. Al–Sadawi argues that the District Court should not have increased his base offense level by 14 points as a result of this total because it was not reasonably foreseeable as part of jointly undertaken criminal activity.

We note that it is unclear that "reasonable foreseeability" is the standard, but we need not reach that question because Al–Sadawi personally and directly participated in the smuggling.[4] He planned and organized the consolidation and packaging of the currency. He brought the suitcase containing $659,000 into the airport and waited while his parents checked the luggage and then attempted to devise a cover story once the currency was discovered. Consistent with this evidence, the District Court found that Al–Sadawi directly participated in the criminal conduct and thus was accountable for the full amount of funds regardless of whether that amount was reasonably foreseeable to him.

To the extent that the District Court relied on U.S.S.G. § 1B1.3(a)(1)(B), it failed to articulate adequately its findings concerning the scope of the activity agreed upon by the conspirators and whether the activity conducted was reasonably foreseeable by the defendant as to the full amount of the money Al–Sadawi attempted to smuggle. *United States v. Studley,* 47 F.3d 569, 574 (2d Cir.1995). Nevertheless, such error was harmless, because the District Court could have clearly relied on subsection A for the reasons stated above.

### CONCLUSION

We affirm the judgement of conviction but remand to the District Court with instructions to consider whether to conduct resentencing in accord with *United States v. Crosby,* 397 F.3d 103 (2d Cir.2005). *See United States v. Garcia,* 413 F.3d 201 (2d Cir.2005).

---

4. In general, a defendant is responsible for all criminal conduct that he or she either personally committed or aided and abetted, regardless of whether the totality of contraband involved in that conduct was known to the defendant. U.S.S.G. § 1B1.3(a)(1)(A). Al–Sadawi clearly participated in this crime, therefore we need not reach the foreseeability requirements of conspiracy.