# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

ANDRE LUCKIE,

        Defendant-Appellant.

UNPUBLISHED
December 20, 2016

No.  328641
Calhoun Circuit Court
LC No.  2014-002918-FH

Before:  M. J. KELLY, P.J., and O'CONNELL and BECKERING, JJ.

PER CURIAM.

A jury convicted defendant, Andre Luckie, of arson of a dwelling house, MCL 750.72, and acquitted him of arson of an insured property, MCL 750.75.[1]  The trial court sentenced defendant as a fourth habitual offender, MCL 769.12, to serve 60 months to 30 years in prison. Defendant appeals as of right.  We affirm defendant's conviction but order a *Crosby* remand.[2]

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

During the early morning hours of July 5, 2009, the house in which defendant had been living with his wife caught fire.  Defendant's wife at the time, Jessica Luckie, had moved out of the house on July 3 following a fight with defendant.  Defendant had remained at the house and was there at the time the fire broke out.  The issue in this case was not whether arson occurred, but who committed the crime.  Plaintiff asserted that defendant started the fire and that he was motivated to do so because he "was very upset with" Luckie and wanted "to get even with her." Defendant argued that he had "nothing . . . to gain by" starting the fire and that Luckie and her family had a motive to do so.

---

[1] The offenses at issue in this case occurred before the current versions of MCL 750.72, first-degree arson, and MCL 750.75, fourth-degree arson, went into effect on April 3, 2013.  Accordingly, all references to MCL 750.72 and MCL 750.75 in this opinion refer to the versions of those statutes that were in effect prior to April 3, 2013.

[2] See *United States v Crosby*, 397 F3d 103 (CA 2, 2005).

Defendant and Luckie were having marital problems and fought on July 3, 2009. Luckie left the home and subsequently returned with her parents to retrieve some belongings. Upon her return, she and defendant continued fighting as she packed. Luckie testified that as she packed her clothes, she realized that someone had sprayed them with bleach. Defendant was alleged to have said at some point during the packing that he was "going to burn" "anything [she] le[ft] behind" and that she had "better take whatever [she] can now because whatever [she] le[ft] [he was] burning." Defendant denied threatening to "burn whatever [she] didn't take with her." Luckie and her family left the home late at night on July 3 or early in the morning on July 4. The parties disputed whether she had access to the home after she left.

Luckie testified that she spent the following morning and day, July 4, 2009, at her parents' house and then went to a party at her friend Kelly Torrez's home. Her father confirmed that she told him that "she was going over to a friend's house" the night of July 4, 2009. Police Officer Gregory Huggett and an insurance claim investigator also confirmed Luckie's whereabouts. Further, the insurance investigator confirmed the whereabouts of Luckie's parents and brothers.

Defendant testified that he was home for most of July 4, 2009, and explained that he typically goes to bed between 9:00 and 10:00 p.m. He offered conflicting testimony on whether he locked all of the home's windows and doors before going to bed that night. He communicated with Luckie during the evening, including sending a message at 1:23 a.m. on July 5, 2009 stating, "Well, too late. It gone now."[3]

Defendant testified that he was awakened in the early morning of July 5, 2009, heard a faint beeping sound from downstairs, and went downstairs and discovered a fire in the family room. He said he grabbed a fire extinguisher and put that fire out, went upstairs to grab his cell phone to call 911, and found smoke upstairs. He subsequently called 911 and also messaged Luckie about the fire. Firefighters arrived at around 3:04 a.m. and "extinguished" the fire "for the most part" within 20 minutes of arrival. They described defendant's odd demeanor; he was standing near the opening of his garage, enshrouded in smoke, wanting to get his car out of the garage "and didn't seem at all concerned about the fire." He was described as "nonchalant,"[4] "[v]ery casual," and "[v]ery calm." Moreover, despite the hour he was described as "fully dressed" in "street clothes" "as though he was going out," including "tied" tennis shoes, a collared shirt, "full length pants," and possibly jewelry.

---

[3] Defendant claimed that he meant to say " 'Too late. You're gone now,' " using the letters " 'u' " and " 'r' " to say "you're," but that his phone "autocorrected and spelled 'it.' "

[4] Defendant testified that just before the fire, he was suffering from depression and began taking mirtazapine and "a generic version of Xanax" to treat his depression." Defense counsel asked pharmacist Aaron Matthew Drake, Ph.D., if taking an antidepressant "for about four or five weeks" could "account for what others may perceive as odd[ or] nonchalant" behavior and Drake responded that although the medication would have a different impact on different people, those behaviors would be "[t]otally common."

Ultimately, it was determined that three separate fires were set: one on a bed in an upstairs bedroom; one on the first floor that had a "pour pattern"; and one in the basement at the bottom of the stairs. The upstairs fire had a pile of women's clothes on the bed that had been burned. Luckie testified that all of the clothes she left behind in her closet had been piled onto the spare bedroom bed and burned. Additionally, the home smelled of gasoline, and samples taken from the three areas tested positive for the "ignitable liquid residue" gasoline. Accordingly, it was determined that the fires were intentionally set. Investigators interviewed both defendant and Luckie. One investigator testified that defendant was "respectful," "polite," and "ostensibly cooperative" during the interview, but said that "many . . . things . . . didn't make sense in [defendant's] story."

Sergeant Gregory Huggett of the Battle Creek Police Department began investigating the fire in early September 2009. He spoke with defendant on September 15, 2009. After speaking to the police once, defendant did not return for follow-up interviews. At the end of September 2009, defendant left Michigan. He was subsequently arrested in 2014 and brought back to Michigan, where he was tried and convicted.

## II. ANALYSIS

### A. JURY INSTRUCTION REGARDING FLIGHT

Defendant first argues that his conviction should be reversed because the trial court abused its discretion by instructing the jury on the use of evidence of flight, M Crim JI 4.4. Defendant contends that he was under no obligation to stay in Michigan when he had not been charged with a crime, but the trial court nevertheless allowed the instruction, finding that there was enough evidence to permit the jury to consider flight, and concluded that defendant did not need to be charged with a crime prior to alleged flight in order for the instruction to be warranted.

We review " 'a trial court's determination whether a jury instruction is applicable to the facts . . . for an abuse of discretion.' " *People v Gillis*, 474 Mich 105, 113; 712 NW2d 419 (2006), quoting *People v Hawthorne*, 265 Mich App 47, 50; 692 NW2d 879 (2005), rev'd on other grounds 474 Mich 174 (2006).

A "trial court is required to give a requested [jury] instruction" if the instruction's "theor[y] or defense[ ] . . . is supported by the evidence." *People v Mills*, 450 Mich 61, 81; 537 NW2d 909, mod on other grounds 450 Mich 1212 (1995). Consistent with M Crim JI 4.4, the trial court instructed the jury as follows:

> There has been some testimony and evidence in this case that the Defendant fled the area after the alleged crime. This evidence alone does not prove guilt. A person may run or hide for innocent reasons, such as panic, mistake or fear. However, a person may also run or hide because of a consciousness of guilt. You must decide whether the evidence about the Defendant's so-called flight is true and, if true, whether it shows that the Defendant had a guilty state of mind.

-3-

In Michigan, flight occurs when a person "leav[es] the jurisdiction" following a crime. *People v Coleman*, 210 Mich App 1, 4; 532 NW2d 885 (1995). "The remoteness of the flight from the time of [a] defendant's arrest d[oes] not affect the admissibility of the evidence." *People v Compeau*, 244 Mich App 595, 598; 625 NW2d 120 (2001). Rather, any remoteness is "relevant only to the weight of the evidence." *Id*. The prosecution need not prove the reason for the flight to justify the instruction. See *People v Smelley*, 485 Mich 1023, 1023; 776 NW2d 310 (2010) (explaining that plaintiff "is not required to prove that [a] defendant left the jurisdiction because he was "motivated by fear of apprehension" to admit flight evidence). Rather, the jury must determine "whether evidence of flight occurred under such circumstances as to indicate guilt." *People v Unger*, 278 Mich App 210, 226; 749 NW2d 272 (2008).

In this case, the arson occurred in Calhoun County in the early morning of July 5, 2009. Defendant left the state to go to Alabama at the end of September 2009. He testified that he went to see his sick mother in Alabama, and moved to Texas in early 2010 to pursue being a disc jockey there. He was on his way to Colorado, where he testified he had a girlfriend he had met online, when he was arrested on a warrant associated with the charged offense. He was held for a few days and released, and he continued on to Colorado. He did not return to Michigan out of fear and lack of resources. He was arrested while in Colorado.

As noted above, the time between the crime and a defendant's decision to leave the state does not affect the admissibility of evidence of flight, it affects its weight. See *Compeau*, 244 Mich App at 598. Since there was admissible evidence of flight, the trial court did not abuse its discretion in instructing the jury according to the model flight jury instruction. *Mills*, 450 Mich at 81; *Gillis*, 474 Mich at 113. It was up to the jury to determine whether defendant left Michigan after the alleged crime because of consciousness of guilt or for one of the many reasons defendant asserted he left and remained away from Michigan: visiting his sick mother, searching for a job, and working on a new relationship. *Unger*, 278 Mich App at 226. The trial court's jury instruction allowed the jury to make such a determination.

Citing 75A Am Jur 2d, Trial, § 1127, defendant asserts that no flight occurred and, thus, the instruction was improper because there was not "evidence that the defendant left the scene and took steps to avoid apprehension" and, therefore, the jury could not "infer consciousness of guilt" from flight. Defendant's secondary source cites *United States v Al-Sadawi*, 432 F3d 419 (CA 2, 2005) and *Rosky v State*, 121 Nev 184; 111 P3d 690 (2005), neither of which are binding on this Court. *People v Jackson*, 292 Mich App 583, 595 n 3; 808 NW2d 541 (2011). We further note that the approaches taken by the Second Circuit Court of Appeals and the Supreme Court of Nevada are not persuasive in light of Michigan law. *Id*. The Second Circuit discusses how it requires "a satisfactory factual predicate . . . from which the jury can infer consciousness of guilt" for a trial court to offer a flight instruction. *Al-Sadawi*, 432 F3d at 424. Similarly, Nevada does not permit a flight instruction unless "the record supports the conclusion that the defendant fled with consciousness of guilt and to evade arrest." *Rosky*, 121 Nev at 199. But Michigan leaves the issue of consciousness of guilt to the jury. See *Unger*, 278 Mich App at 226; M Crim JI 4.4. Further, 75A Am Jur 2d, Trial, § 1127 acknowledges that federal circuits and states are split on when to offer flight instructions. Michigan has not adopted the proposition that a flight instruction cannot be offered unless the defendant took steps to avoid apprehension. See *Smelley*, 485 Mich at 1023.

## B. USE OF JUDICIAL FACT-FINDING TO SCORE OVS

Defendant next asserts that the trial court violated his Sixth Amendment rights by using judicial fact-finding to score offense variables (OVs) 2, 4, 9 and 19 at the time of his July 20, 2015 sentencing, which increased his guideline minimum sentencing range, and that he is therefore entitled to a *Crosby* remand.[5] We agree.

At sentencing, defendant argued that OVs 2, 4, 9, and 19 should be scored at zero points because the trial court had insufficient evidence to score these OVs. The trial court scored OV 2 at 15 points, OV 4 at 10 points, OV 9 at 10 points, and OV 19 at 10 points, giving defendant a total OV score of 45 points. Further, the trial court calculated a total prior record variable (PRV) score of 20, identified defendant as a fourth habitual offender, and identified defendant as a Class B offender based on his arson conviction. Doing so yielded a guideline minimum sentencing range of 45 to 150 months, and the trial court sentenced defendant within this range.

In *People v Lockridge*, 498 Mich 358, 364; 870 NW2d 502 (2015), our Supreme Court held that Michigan's sentencing guidelines are "constitutionally deficient" to "the extent [that they] *require* judicial fact-finding beyond the facts admitted by the defendant or found by the jury to score offense variables (OVs) that *mandatorily* increase the floor of the guidelines minimum sentence range . . . ." Such a scheme "violates the Sixth Amendment." *Id*. at 373. Instead, "[a]ny fact that, by law, increases the penalty for a crime is an "element" that must be submitted to the jury and found beyond a reasonable doubt." *Alleyne v United States*, ___ US ___; 133 S Ct 2151, 2155; 186 L Ed 2d 314 (2013).

In order to determine whether defendant is entitled to relief under *Lockridge,* it is necessary to determine whether or not facts admitted by defendant and facts found by the jury were sufficient to assess the minimum number of OV points necessary for "defendant's score to fall in the cell of the sentencing grid under which he ... was sentenced." *Lockridge*, 498 Mich at 394. If the facts admitted by defendant and found by the jury "were *insufficient* to assess the minimum number of OV points necessary for the defendant's score to fall in the cell of the sentencing grid under which he or she was sentenced," then defendant is entitled to have the case "remanded to the trial court to determine whether that court would have imposed a materially different sentence but for the constitutional error." *Id.* at 395, 397.

In this case, defendant argues that the trial court incorrectly used judicial fact-finding to score OVs 2, 4, 9 and 19. Defendant denied any wrongdoing in this case, but the jury found that he (1) willfully or maliciously (2) burned (3) a dwelling house, the contents of a dwelling house, any building within the curtilage of a dwelling house, or the contents of a building within the

---

[5] Defendant filed a motion to remand with this Court, seeking a *Crosby* remand. A panel of this court denied the motion at that time. *People v Luckie*, unpublished order of the Court of Appeals, entered May 3, 2016 (Docket No. 328641). Defendant preserved this issue by raising it in a motion to remand filed with this Court. MCR 6.429(C).

curtilage of a dwelling house. See MCL 750.72. These jury findings do not overlap with the fact-finding required to score OVs 2, 4, 9 and 19.

OV 2 "scores the 'lethal potential of the weapon possessed or used.' " *People v Hutcheson*, 308 Mich App 10, 16; 865 NW2d 44 (2014), quoting MCL 777.32(1). Here, the trial court tied the 15-point OV 2 score to defendant's possession of gasoline. Fifteen points can be scored under OV 2 if a defendant "possessed or used an incendiary device," defined to include gasoline, MCL 777.32(1)(b) and (3)(d), "as a weapon," *People v Jackson*, 497 Mich 857, 858; 852 NW2d 897 (2014) (explaining that possession of an incendiary device to "manufactur[e] methamphetamine" did not constitute "possess[ion] or use[ ]" of an incendiary device "as a weapon"). But the jury here did not specifically find that defendant possessed or used gasoline in the arson or that he possessed or used gasoline as a weapon. See MCL 750.72.

OV 4 governs "psychological injury to a victim." MCL 777.34(1). Ten points are assigned when "[s]erious psychological injury requiring professional treatment occurred to a victim." MCL 777.34(1)(a). The jury made no such finding.

OV 9 addresses "the number of victims." MCL 777.39(1). To score OV 9, a trial court must first "[c]ount each person who was placed in danger of physical injury or loss of life or property as a victim." MCL 777.39(2)(a). Then, the trial court must assign 10 points if "2 to 9 victims . . . were placed in danger of physical injury or death, or 4 to 19 victims . . . were placed in danger of property loss." MCL 777.39(1)(c). The jury did not make either finding.

OV 19 governs a "threat to the security of a penal institution or court or interference with the administration of justice or the rendering of emergency services." MCL 777.49. The trial court must assign 10 points when the defendant "otherwise interfered with or attempted to interfere with the administration of justice." MCL 777.49(c). The variable "is generally scored for conduct that constitutes an attempt to avoid being caught and held accountable for the sentencing offense." *People v Sours*, ___ Mich App ___; ___ NW2d ___ (2016) (Docket No. 326291), slip op at 2. Although there was evidence that defendant left Michigan after the fire, possibly in an attempt to avoid being caught, the jury made no such finding.

If these OVs had not been scored, defendant would have had a total OV score of 0, not 45. The guideline minimum sentencing range for a defendant who is a Class B, fourth habitual offender with a total PRV score of 20 and a total OV score of 0 is 24 to 80 months. MCL 777.16c, as amended by 2000 PA 279; MCL 777.63. This range is lower than the guideline minimum sentencing range of 45 to 150 months calculated by the trial court by using judicial fact-finding. Hence, defendant is entitled to a *Crosby* remand. See *Lockridge*, 498 Mich at 395-399.

## III. CONCLUSION

We affirm defendant's conviction. However, because defendant has established that his guidelines minimum sentence range was actually constrained by a violation of the Sixth Amendment and he was sentenced within those guidelines, we order a *Crosby* remand.

We do not retain jurisdiction.

/s/ Michael J. Kelly
/s/ Peter D. O'Connell
/s/ Jane M. Beckering