[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 22-13809

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

SAMUEL ODEKHIRAN,
a.k.a. Samuel Edeki Odekhiran,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:21-cr-00391-LMM-JKL-1

_____

Before WILSON, BRANCH, and LUCK, Circuit Judges.

PER CURIAM:

Samuel Odekhiran appeals his conviction for aiding and abetting wire fraud, arguing that (1) the district court abused its discretion in admitting evidence that he fled to Canada after he learned that the government was filing a criminal complaint against him, and (2) the evidence was insufficient to sustain his conviction. After review, we affirm.

## I.    Background

On January 28, 2019, a magistrate judge authorized a criminal complaint alleging that Odekhiran sent a wire transfer of funds in furtherance of a scheme to defraud, in violation of 18 U.S.C. §§ 1343 and 2. Thereafter, in October 2021, a grand jury indicted Odekhiran on one count of aiding and abetting wire fraud, in violation of 18 U.S.C. §§ 1343 and 2. The indictment alleged that the scheme ran from February 2017 to approximately June 2018. During this time, Odekhiran registered a company, Davinci Trading and Logistics, LLC, with the Georgia Secretary of State and opened up at least 13 bank accounts with 12 different financial institutions. He received wire transfers totaling more than $3 million from various persons and entities and then promptly transferred the funds out of the business accounts "to destinations including an entertainment business in Nigeria as well as unknown entities in China."

The indictment further alleged that victims K.L. and M.L. sought to sell a condominium they owned off the coast of Venezuela, and they hired a management company to manage the sale.  In June 2017, an agent with the management company, R.G., received a fraudulent email which looked to be from K.L. with wiring instructions for the proceeds from the sale of the condominium.  The instructions directed that the funds be wired into an account opened and controlled by Odekhiran.  The agent followed the instructions and wired $259,312 to this account.  Odekhiran kept some of the funds for himself and then wired the rest to other participants.

Prior to trial, the government filed a motion *in limine* seeking to admit evidence of Odekhiran's pre-trial flight to Canada.  Specifically, the government explained that it had engaged in pre-indictment discussions with Odekhiran and his counsel in hopes of obtaining a "pre-indictment resolution."  However, when those discussions failed, the government applied for a criminal complaint and arrest warrant for Odekhiran in January 2019, and it coordinated a voluntary surrender with his attorney.  However, Odekhiran did not show up for the scheduled surrender.  Instead, agents discovered that he fled to Canada, and he remained there while the government tried to extradite him.  The government argued that evidence of Odekhiran's flight should be admitted as consciousness of guilt.

Odekhiran objected to the admission of such evidence.  He argued that his flight was not probative of his guilt because it was

too remote in time from the crime and start of the investigation to support an inference of guilt given that he fled months after he learned that he was a target of the government's investigation and had been engaged in negotiations with the government about a deal. He argued that based on the delayed timing of his flight, there were other plausible explanations for his flight other than guilt, such as fear of detention, immigration consequences, and a wrongful conviction.

The district court held a hearing on the motion. Following extensive arguments by the parties, the district court held that the evidence of flight was admissible. The district court rejected Odekhiran's argument that the flight was too remote in time, explaining that there was no timing issue once all the facts and circumstances were examined because this case involved a "ramping up" situation where

> there was an attempt to negotiate a pre-indictment resolution, and that fell apart, and then you've got the arrest warrant and then the voluntary surrender date and the fleeing happening so close to the point at which this is becoming extremely real, and he's going to have to voluntarily surrender . . . .

At trial, Kevin Hall, an FBI agent, testified that he investigated business e-mail compromise schemes, which involved using legitimate and spoofed e-mail addresses to change wire instructions and divert payments to accounts controlled by the scammers. In this case, e-mail accounts for K.L. and the management company's agent, R.G., were spoofed to perpetrate a

fraud.  K.L.'s spoofed e-mail account was traced back to an IP address in Nigeria.  K.L.'s spoofed e-mail account instructed R.G. to send the money from the condominium sale to a SunTrust bank account owned by Davinci Trading—which was registered to Odekhiran—and not K.L.  Indeed, K.L. did not have a bank account with SunTrust.

Davinci Trading was registered to Odekhiran.  The business address for Davinci Trading was Odekhiran's residence, and its listed purpose was wholesale trading, "specifically other groceries and related products."  Odekhiran opened the SunTrust bank account and was the only signatory on the account.  Between June 27 and June 28, 2017, $259,312 was deposited into Davinci Trading's SunTrust bank account with the purpose for the transfer listed as the sale of "Seaside Apartment 301."

Notably, on June 27, 2017, after receiving notification of the impending wire, Odekhiran reached out to SunTrust via an online customer portal and stated "please return any transfer from the attachment herein.  I am not expecting any money from them as it is a transaction I don't know."  However, the next day, Odekhiran again e-mailed customer care asking the bank to disregard his prior message and stating that he had "confirmed the origin and purpose" of the transfer and that it came from a customer.  A bank employee from SunTrust testified that Davinci Trading confirming the accuracy of the transaction would have delayed any type of fraud investigation by the bank.  The next day, $209,000 was

transferred from Davinci Trading's account to an overseas account in China.

When Hall reviewed Odekhiran's e-mail account, he found e-mails tied to the K.L. real estate fraud but none that revealed Odekhiran had direct knowledge of the fraud. Hall confirmed that there was no evidence that Odekhiran created the spoofed e-mail account.

Odekhiran told Hall during an interview at his home that Davinci Trading imported groceries and clothing from Nigeria to sell to the local community. Odekhiran told Hall that he obtained customers by "word of mouth." He explained that he sometimes shipped goods directly to his customers, and other times, he received the goods at his home and then distributed them. Odekhiran said that customers sent money to him for goods in Nigeria because they were uncomfortable sending money directly to Nigeria and then he would forward the money on to Nigeria. Upon execution of a search warrant on Odekhiran's home—which again was the registered address of the business—agents found no inventory, invoices, customer lists, shipping boxes, or items related to running a business.

Odekhiran told Hall that he was working with a sourcing agent in Nigeria, Ethel Ikeji, who split the revenue with him. Hall subpoenaed e-mails from Ikeji and discovered that he too was "defrauding people." Hall then obtained an international warrant for Ikeji's arrest.

Hall further testified as to details concerning other bank accounts at other financial institutions that belonged to Davinci Trading on which Odekhiran was the signatory. Large-sum suspicious wire transactions were also made into and out of these accounts both domestically and internationally. Some of these banks contacted Odekhiran and questioned the wire activity. In total, Hall discovered 12 bank accounts with $3 million wired into them. Yet, there were no tax records for Davinci Trading for 2016 through 2018. And Odekhiran personally reported $57,521 in gross income for him and his wife for 2017.

Four victims of fraud involving Davinci Trading testified for the government. In addition to testimony from K.L. about the stolen proceeds from the condominium sale, another victim testified that she was scammed by a person she met online claiming to be an art dealer. She sent money on multiple occasions to this person, and on one of those occasions she wired money into one of Davinci Trading's bank accounts. She never received any goods in exchange and she did not know or interact with Odekhiran. Another victim was a real estate investor. He purchased an investment property and intended to wire approximately $73,000 to the title company. Prior to the transfer, his company received an e-mail purportedly from the title company with new wiring instructions. They followed the instructions and wired the money into an account belonging to Davinci Trading, not the title company. The victim did not know Odekhiran and had never done business with him or Davinci Trading. The victim called his bank and was able to stop the wire and recoup the money. Another

victim was scammed by a man she met through a dating app.  She sent the man money for medical bills and legal fees.  She wired the money to an account owned by Davinci Trading.  She did not know Odekhiran and did not do any business with Davinci Trading.

The district court then read a stipulation from the parties including the following facts.  In 2019, the government charged Odekhiran with aiding and abetting wire fraud, and Odekhiran was told by his counsel to voluntarily surrender to authorities on February 7, 2019, at the courthouse.  Odekhiran did not surrender to authorities and was later found in Canada.  He crossed over into Canada on or about February 7 or 8, 2019.

Odekhiran called one witness—his sister.  She testified that Ikeji was Odekhiran's childhood friend.  She offered her opinion that her brother was a law-abiding, honest, and truthful person.

At the close of the government's evidence, Odekhiran moved for a judgment of acquittal based on insufficient evidence, arguing that the government failed to prove that he "knowingly joined" a wire fraud offense.  He argued that he was "duped" by Ikeji and that there was no evidence that he knew that criminal conduct was occurring, and that he made an informed choice to participate.[1]

The district court denied Odekhiran's motion and stated that there was sufficient evidence of knowledge and intent to

---

[1] Odekhiran later renewed this motion.

submit the case to the jury. The court stated that as to the K.L. wire in question, there was evidence that Odekhiran's communications with SunTrust Bank about that wire and its origin delayed any investigation, and that Odekhiran lied to the bank about talking with the customer for that transaction.

Prior to closing arguments, the court instructed the jury that intentional flight "immediately after a crime has been committed or after [the defendant] is accused of a crime" was not by itself sufficient to show guilt but could be considered during the overall determination of guilt. Further, the court instructed the jury that whether or not Odekhiran's conduct constituted flight or showed a consciousness of guilt was exclusively for the jury to determine. And, in making these determinations, the jury should "consider that there may be reasons for [the defendant's conduct] which are fully consistent with innocence," including "fear of being apprehended, unwillingness to confront the police, or reluctance to confront the witness." Moreover, the court cautioned that "a feeling of guilt does not necessarily reflect actual guilt of a crime."

With regard to the knowledge element of the offense, the district court instructed the jury that knowledge could also be proven by showing that Odekhiran deliberately avoided learning that he was part of a fraud but that "negligence, carelessness, or foolishness" was not enough to show knowledge.

The jury returned a verdict of guilty, and Odekhiran was subsequently sentenced to 60 months' imprisonment to be

followed by three years' supervised release. Odekhiran now appeals his conviction.

## II.    Discussion

### A.  Admission of the evidence of flight

Odekhiran argues that the district court abused its discretion when it admitted the allegedly highly prejudicial evidence of his flight to Canada. He maintains that he knew for nine months prior to his flight that he was the suspect of an investigation, and, therefore, his flight was too far removed from the criminal activity and the initial investigation to support an inference of consciousness of guilt.

We review the district court's decision to admit evidence of a defendant's flight for abuse of discretion, and that decision will not be overturned "absent a showing of clear abuse." *United States v. Blakey*, 960 F.2d 996, 1001 (11th Cir. 1992); *see also United States v. Frazier*, 387 F.3d 1244, 1258 (11th Cir. 2004) ("[T]he deference that is the hallmark of abuse-of-discretion review[] requires that we not reverse an evidentiary decision of a district court unless the ruling is manifestly erroneous." (quotations and internal citation omitted)). Moreover, "even an abuse of discretion will not warrant reversal where the resulting error was harmless. We will not overturn an evidentiary ruling and order a new trial unless the objecting party has shown a substantial prejudicial effect from the ruling." *United States v. Barton*, 909 F.3d 1323, 1330–31 (11th Cir. 2018) (quotations omitted); *see also United States v. Al-Sadawi*, 432 F.3d 419, 424–25 (2d Cir. 2005) (applying harmless error standard

to evidence of flight). "Substantial prejudice goes to the outcome of the trial; where an error had no substantial influence on the outcome, and sufficient evidence uninfected by error supports the verdict, reversal is not warranted." *Barton*, 909 F.3d at 1331 (quotations omitted).

"Evidence of flight is admissible to demonstrate consciousness of guilt and thereby guilt." *United States v. Williams*, 541 F.3d 1087, 1089 (11th Cir. 2008) (quotations omitted). We have explained that the probative value of flight evidence as circumstantial evidence of guilt

> depends upon the degree of confidence with which four inferences can be drawn: (1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt concerning the crime charged; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged.

*United States v. Borders*, 693 F.2d 1318, 1325 (11th Cir. 1982) (quoting *United States v. Myers*, 550 F.2d 1036, 1049 (5th Cir. 1977)). However, the probative value of flight evidence "is diminished . . . if there has been a significant time delay between the commission of the crime or the point at which the accused has become aware that he is the subject of a criminal investigation, to the time of flight." *Williams*, 541 F.3d at 1089 (quotations omitted).

Odekhiran's argument that the district court abused its discretion in admitting the flight evidence because it was too

removed from his commission of the crime or the point at which he became aware that he was the subject of investigation is unpersuasive. In this case, there was sufficient circumstantial evidence to support the district court's conclusion that a jury could reasonably infer consciousness of guilt of the crime charged from Odekhiran's flight. Although the flight was remote in time to when the crime occurred and when Odekhiran first learned of the initial investigation, it was proximate in time to the filing of the formal criminal complaint against him and the scheduled date of his voluntary surrender. Given the totality of the circumstances, it was within the court's broad discretion to conclude that there was no "immediacy" problem with the flight evidence, and Odekhiran has not shown that the district court's decision was "manifestly erroneous." *Frazier*, 387 F.3d at 1258. Furthermore, we have upheld admission of flight evidence under similar circumstances. *See, e.g.*, *Blakey*, 960 F.2d at 1000–01 (upholding admission of evidence of flight where "[t]he flight occurred three years after the [crime]" and where "there was some evidence that [the defendant] knew than an indictment had been issued against him or at least that he was under investigation"); *United States v. Ramon-Perez*, 703 F.2d 1231, 1232–33 (11th Cir. 1983) (holding flight evidence admissible as consciousness of guilt where defendant fled within several weeks of his formal arrest and release on bond and a few days before a scheduled hearing).

Moreover, even assuming that the district court abused its discretion in admitting this evidence, any error was harmless in light of the court's limiting instruction on the flight evidence and

the other overwhelming evidence against Odekhiran.  *Barton*, 909 F.3d at 1331; *Al-Sadawi*, 432 F.3d at 425.  Accordingly, Odekhiran is not entitled to relief on this claim.

### B.  *Sufficiency of the evidence*

Odekhiran argues that the evidence was not sufficient to prove beyond a reasonable doubt that he knew about and intended to aid a scheme to defraud at the time of the wire transfer in June 2017 related to the K.L. property.

"We review the sufficiency of the evidence to support a conviction *de novo*, viewing the evidence in the light most favorable to the government and drawing all reasonable inferences and credibility choices in favor of the jury's verdict." *United States v. Taylor*, 480 F.3d 1025, 1026 (11th Cir. 2007).  "[W]e will not disturb a guilty verdict unless, given the evidence in the record, no trier of fact could have found guilt beyond a reasonable doubt." *United States v. White*, 663 F.3d 1207, 1213 (11th Cir. 2011) (quotations omitted).  "[T]he evidence need not be inconsistent with every reasonable hypothesis except guilt, and the jury is free to choose between or among the reasonable conclusions to be drawn from the evidence presented at trial." *United States v. Watts*, 896 F.3d 1245, 1251 (11th Cir. 2018) (quotations omitted).  Notably, "[t]he test for sufficiency of the evidence is identical regardless of whether the evidence is direct or circumstantial, and no distinction is to be made between the weight given to either direct or circumstantial evidence." *Id.* (quotations omitted).

Odekhiran was convicted of aiding and abetting wire fraud in violation of 18 U.S.C. §§ 1343 and 2. "In order to prove that the defendant aided and abetted an offense, the government must establish that: (1) someone else committed [wire fraud]; (2) the defendant committed an act that contributed to and furthered the offense; and (3) the defendant intended to aid in the commission of the offense." *United States v. Cruickshank*, 837 F.3d 1182, 1189 (11th Cir. 2016). Wire fraud requires that the government prove beyond a reasonable doubt that the defendant knowingly "(1) participated in a scheme or artifice to defraud; (2) with intent to defraud; and (3) used, or caused the use of, interstate wire transmissions for the purpose of executing the scheme or artifice to defraud." *United States v. Machado*, 886 F.3d 1070, 1082–83 (11th Cir. 2018) (quotations omitted); *see also United States v. Maxwell*, 579 F.3d 1282, 1299 (11th Cir. 2009) (explaining that mail and wire fraud require the government to prove that the defendant "knew of and willfully joined in the unlawful scheme to defraud").

Here, Odekhiran argues that the evidence was insufficient to show that he knowingly participated in a scheme or artifice to defraud and that he knowingly acted with an intent to defraud. A defendant acts knowingly when he acts with actual knowledge or deliberate ignorance. *United States v. Rivera*, 944 F.2d 1563, 1570–71 (11th Cir. 1991). Deliberate ignorance means that the defendant had "his suspicion aroused but then deliberately omits to make further enquiries, because he wishes to remain in ignorance." *Id.* at 1570; *see also United States v. Hristov*, 466 F.3d 949, 952 (11th Cir. 2006) ("We have long recognized that the knowledge element of a

violation of a criminal statute can be proved by demonstrating either actual knowledge or deliberate ignorance." (quotations omitted)). Additionally, a jury may infer intent from the defendant's conduct and circumstantial evidence. *Maxwell*, 579 F.3d at 1299.

Odekhiran's argument that there was insufficient evidence to prove his knowledge and intent to defraud at the time of the June 28, 2017, wire transfer involving K.L.'s condominium sale is premised on the idea that in determining knowledge and intent, the jury was limited to considering only evidence that occurred prior to the June 28, 2017, transaction. In other words, according to Odekhiran, the jury could not look to the evidence concerning transactions that occurred after that date to determine Odekhiran's knowledge and intent. His argument is misplaced. Here, it was necessary for the government to prove that the Odekhiran intentionally aided and abetted a scheme and artifice to defraud. And it is well-established that "[o]ther transactions connected with the offenses charged have long been used to show a general pattern, the necessary criminal intent, or the guilty knowledge of the defendant." *United States v. Muscatell*, 42 F.3d 627, 631 (11th Cir. 1995); *United States v. Martinez*, 466 F.2d 679, 683–84 (5th Cir. 1972)[2] ("When intent and knowledge are essential elements of the crime

---

[2] *See Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc) (holding that all decisions from the Fifth Circuit Court of Appeals issued prior to the close of business on September 30, 1981, are binding precedent in the Eleventh Circuit).

for which the defendant is being tried, evidence of other transactions, even though criminal in nature, is admissible to prove the necessary criminal intent or guilty knowledge, if the transactions are so connected with the offense charged that they serve to show a general pattern." (quotations omitted)); *Gilstrap v. United States*, 389 F.2d 6, 9 (5th Cir. 1968) ("Evidence that similar or related offenses were committed over a period of time tends to show a consistent pattern of conduct highly relevant to the issue of intent.").

Regardless, even setting aside the evidence of fraudulent activity that occurred with Davinci Trading's bank accounts after the June 28, 2017, transaction, we conclude that there was ample evidence from which a jury could find beyond a reasonable doubt that Odekhiran was deliberately ignorant of his role in the scheme. For instance, the government presented evidence that Odekhiran registered Davinci Trading with the Georgia Secretary of State in February 2017 as a wholesale trading company operated out of his residence. But there was no evidence that the company ever engaged in any legitimate business activity—there was no record of any goods received or shipped or any sales and Davinci did not file taxes for 2017. Yet, between March 2017 and June 2017, Odekhiran opened multiple business bank accounts in the name of the company at different financial institutions and was the sole signatory. He then received and sent several large sum domestic and international wire transfers from each of the accounts between March and June 2017 despite no indication of legitimate business activity. Furthermore, although he initially flagged the K.L.

transaction and requested that SunTrust return the funds, he retracted his request the next day, stating that he had confirmed the origin and purpose of the transfer and that it came from a customer—and it is undisputed that this was a false statement.

Viewed in the light most favorable to the government, the jury could have reasonably inferred from the above stated evidence that Odekhiran was deliberately ignorant. In other words, it was entirely reasonable for the jury to conclude that, after Odekhiran received no goods and had no orders for goods but was receiving wire transfers for large sums, his suspicions should have been aroused and he deliberately declined to inquire into the true nature of Davinci Trading. *See Rivera*, 944 F.2d at 1570; *Hristov*, 466 F.3d at 952. Accordingly, there was sufficient evidence to support the knowledge and intent element and to sustain his conviction for aiding and abetting wire fraud.

### III.    Conclusion

For the above reasons, we affirm Odekhiran's conviction.

**AFFIRMED.**